In re Michael Kenneth ROSE, Debtor.

Peggy Ann Buckner, Debtor,

Clyde E. Steele, Debtor,

Douglas Ray Smith, Debtor,

Ingrid Anna Lynch, a/k/a Ingrid Anna Beverly, Debtor,

Heather Rhanae Barnette, Debtor,

Claudia Sebring, Debtor,

Silia Jean Jackson, Debtor,

Josh Wiley, Tracey Wiley, a/k/a Tracey Stephens, Debtors,

Johnny Richardson, Mary Richardson, Debtors,

Regina Ann Hance, Debtor.

Nos. 04–31145, 04–31270, 04–31327, 04–31499, 04–31700, 04–31701, 04–31752, 04–31905, 04–32328, 04–32423, 04–32550.

United States Bankruptcy Court, E.D. Tennessee.

Aug. 18, 2004.

Charles F. Vihon, Esq., Western Springs, IL, for Kristin Motley.

Harry S. Mattice, Jr., Esq., United States Attorney, Suzanne H. Bauknight, Esq., Pamela G. Steele, Esq., Knoxville, TN, for United States of America appearing specially for Richard F. Clippard, Esq., United States Trustee, Region 8.

John P. Newton, Jr., Esq., Knoxville, TN, for Debtor, Michael Kenneth Rose.

Richard M. Mayer, Esq., Knoxville, TN, for Debtor, Peggy Ann Buckner.

John H. Fowler, Esq., Sevierville, TN, for Debtor, Clyde E. Steele.

Brandt W. Davis, Esq., Knoxville, TN, for Debtor, Silia Jean Jackson.

William T. Hendon, Knoxville, TN, Chapter 7 Trustee for Debtor, Michael Kenneth Rose.

Ann Mostoller, Esq., Oak Ridge, TN, Chapter 7 Trustee for Debtors, Peggy Ann Buckner, Clyde E. Steele, and Josh and Tracey Wiley.

Michael H. Fitzpatrick, Esq., Knoxville, TN, Chapter 7 Trustee for Debtors, Douglas Ray Smith and Regina Ann Hance.

Sterling P. Owen, IV, Knoxville, TN, Chapter 7 Trustee for Debtors, Ingrid Anna Lynch, Heather Rhanae Barnette, and Claudia Sebring.

Dean B. Farmer, Esq., Knoxville, TN, Chapter 7 Trustee for Debtors, Silia Jean Jackson and Johnny and Mary Richardson.

## MEMORANDUM ON BANKRUPTCY PETITION PREPARER SHOW CAUSE ORDERS AND ON RELATED OBJECTION AND MOTION

RICHARD S. STAIR, Jr., Bankruptcy Judge.

This matter was heard on July 13, 2004, on the court's *sua sponte* Orders entered on April 9 and May 17, 2004,[1] requiring Kristin Motley (Ms. Motley), a bankruptcy petition preparer, to appear (1) so that the court might determine whether the $214.00 total fee paid by the Debtors to Ms. Motley in each of these eleven bankruptcy cases for "document preparation services" is in excess of the value of the services rendered, (2) to show cause why certain specified services rendered to the Debtors by Ms. Motley should not be found to constitute violations of 11 U.S.C.A. § 110 (West 1994 & Supp.2004), including 11 U.S.C.A. § 110(k), which prohibits a bankruptcy petition preparer from engaging in the unauthorized practice of law, and (3) to show cause why a fine should not be imposed against her in each case, and/or why she should not be enjoined from engaging in the proscribed conduct. Also before the court are the Respondent's Objection to Order to Show Cause filed on June 9, 2004 (Objection), and the Respondent, Kristin Motley's, Motion for Certification of a Question to the Supreme Court of Tennessee filed on July 7, 2004 (Motion for Certification).

On July 7, 2004, Ms. Motley filed the Respondent, Kristin Motley's, Brief With Respect to the Matter of the Unauthorized Practice of Law, and on July 9, 2004, the United States of America (United States), appearing specially on behalf of Richard F. Clippard, United States Trustee, Region 8 (U.S.Trustee), filed the Memorandum of the United States of America in Support of Sanctions and an Injunction Against Kristin Motley d/b/a We the People Forms and Service Center of Knoxville.[2] Additional-

1. The court will identify each individual show cause order by date, or if necessary, will refer to the orders collectively as "Show Cause Orders."

2. "The U.S. Trustee may raise and may appear and be heard on any issue in any case or proceeding under this title[.]" 11 U.S.C.A. § 307 (West 1993). Historically, the U.S. Trustee is represented by staff counsel; how-

ever, the United States Attorney is appearing specially on behalf of the U.S. Trustee in the present matters because on May 5, 2004, Ms. Motley filed the Motion of Kristin Motley d/b/a We the People Forms and Service Center of Knoxville for an Order to Show Cause in eight cases, Nos. 04–31145, 04–31270, 04–31327, 04–31499, 04–31700, 04–31701, 04–31752, and 04–31905, requesting an order requiring Richard F. Clippard, U.S. Trustee,

ly, at the close of proof on July 13, 2004, Ms. Motley's counsel requested permission to file a supplemental post-trial memorandum, and pursuant to the court's authorization, filed the Respondent, Kristin Motley's, Post–Trial Brief filed on July 23, 2004 (Post–Trial Brief). In her Post–Trial Brief, Ms. Motley restated the issues raised in her Objection to the court's Show Cause Orders, in addition to, for the first time, advancing arguments that she has been denied proper due process, challenging the authority of Congress to enact § 110 under the Bankruptcy Clause of the United States Constitution, and arguing that § 110(h), (i), and (j) are vague and overbroad. In response, the United States filed the Post–Hearing Brief of the United States of America in Support of Sanctions and an Injunction Against Kristin Motley d/b/a We the People Forms and Service Center of Knoxville on July 28, 2004.[3]

The record before the court consists of two Affidavits filed by Ms. Motley, thirteen exhibits entered into evidence at the July 13, 2004 hearing, and the testimony of Ms. Motley and Tracey Wiley, one of the Debtors. Additionally, pursuant to Federal Rule of Evidence 201, the court takes judicial notice of all documents filed in each of the eleven bankruptcy cases.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A), (O) (West 1993).

## I

### Procedural Background

Ms. Motley, together with her husband, owns Motley 4, LLC. Through this company, Ms. Motley operates We the People Forms & Service Centers of Knoxville (We the People of Knoxville), a franchise of We the People Forms & Service Centers USA, Inc. (We the People USA), which provides legal document preparation services. Ms. Motley is not an attorney licensed to practice law in the State of Tennessee, and she testified that neither she nor her husband has ever worked in a law office. At issue in these eleven (11) bankruptcy cases is Ms. Motley's preparation of the Chapter 7 bankruptcy petitions, statements, and schedules for a fee in each case of $199.00 plus a copy charge of $15.00. In addition to bankruptcy document preparation, Ms. Motley testified that We the People of Knoxville offers the preparation services for approximately fifty other types of legal documents, including, among others, uncontested divorces, powers of attorney, name changes, wills, and trusts. Ms. Motley opened We the People of Knoxville in January 2004, and she is its only employee, although she testified that her husband occasionally assists her by answering phones. She purchased the franchise in September 2003, for $89,500.00, and she pays a monthly fee of 25% of her gross profits to We the People USA. In exchange, We the People USA provides Ms. Motley with the assistance of a supervising attorney, the assistance of a typist/processor, television advertisements, corporate support, documents for distribution, and use of the company's name.

Each of the eleven bankruptcy cases that were the subject of the July 13, 2004 hearing were filed by the Debtors, *pro se*, utilizing the services of Ms. Motley and

and Patricia C. Foster, Attorney for the U.S. Trustee, to show cause why they should not be held in contempt for certain actions described in the motion. A hearing on this motion is presently set for October 18, 2004. Pending resolution of Ms. Motley's motion, the United States Department of Justice has

delegated the United States Attorney to represent the interests of the U.S. Trustee.

3. Additional documents were filed by the U.S. Attorney and Ms. Motley; however, they were filed after the close of proof and were therefore not considered.

We the People of Knoxville.[4] In eight of the cases, Nos. 04–31145, 04–31270, 04–31327, 04–31499, 04–31700, 04–31701, 04–31752, and 04–31905, the court, *sua sponte*, entered the April 9, 2004 Order, directing Ms. Motley to perform the following actions in each case: (1) file an affidavit by April 22, 2004, detailing the time, nature, and extent of the services rendered by Ms. Motley and a co-employee, Heather Silas (Ms. Silas), to the respective Debtors; (2) file a copy of all documents and instructions provided each Debtor prior to preparing their respective bankruptcy petitions; (3) file a copy of all documents given to her by the Debtors to assist in the preparation of the respective bankruptcy petitions; and (4) appear before the court on April 29, 2004, at which time the court would determine whether the $214.00 fee charged to and paid by each Debtor for "document preparation services" exceeded the value of the services rendered.[5]

On April 15, 2004, Ms. Motley filed two motions relevant to the issues presently before the court: (1) Respondent, Kristin Motley's, Motion for Joint Administration for Procedural Purposes Only, requesting that Case Nos. 04–31145, 04–31270, 04–31327, 04–31499, 04–31700, 04–31701, 04–31752, and 04–31905, be jointly administered for procedural purposes to facilitate resolution of the common issues raised by the court's March 2, 2004 Order; and (2) Respondent, Kristin Motley's, Motion to Reschedule Production and Hearing, requesting an extension of time within which

to file the documents required by the March 2, 2004 Order, and requesting a continuance of the April 29, 2004 hearing. On April 21, 2004, the court entered two Orders in each of the affected cases. The first Order directed the joint administration of the eight cases "solely for procedural purposes," and the second Order continued the April 29, 2004 hearing to May 13, 2004, extending the time within which Ms. Motley was to produce the required documents to May 6, 2004.

On May 6, 2004, Ms. Motley filed an identical Affidavit (May 6, 2004 Affidavit) in each of the original eight cases that only partially complied with the directives set forth in the April 9, 2004 Order.[6] Accompanying each of the May 6, 2004 Affidavits was a packet of six documents that Ms. Motley stated were provided to each Debtor at the initial interview. This packet includes a Bankruptcy Document Preparation Agreement, Chapter 7 Voluntary Petition Customer Information Workbook, Tennessee Step By Step Guide to the Bankruptcy Workbook, Bankruptcy Overview—Chapter 7 Tennessee, Federal Bankruptcy Courts—Where to File Your Petition, and Tennessee Bankruptcy Exemptions.[7] COLL. TRIAL Ex. 1. Additionally, Ms. Motley filed copies of the Customer Information Workbook completed and signed by the Debtors in each of the original eight cases. TRIAL EXS. 2 through 9.

---

**4.** Four of the Debtors, Michael Kenneth Rose, Peggy Ann Buckner, Clyde R. Steele, and Silia Jean Jackson, have since retained counsel.

**5.** The Disclosure of Compensation of Bankruptcy Petition Preparer filed by Ms. Motley in each case evidences that she agreed to accept and actually received $214.00 in each case. Of the $214.00 "document preparation" fee paid by the Debtors, $199.00 was for

"Typing Petition" and $15.00 was for "Copy Fee."

**6.** While the Affidavit discussed the services provided by Ms. Motley and Ms. Silas to the Debtors, it did not detail the time, nature, and extent of these services as directed by the court.

**7.** These documents will collectively be referred to as the "Customer Packet."

On May 13, 2004, the court held the hearing directed by the April 9, 2004 Order; however, the court did not hear any proof. Instead, after discussions with counsel for Ms. Motley and the U.S. Trustee, the court entered the May 17, 2004 Order, directing the following: (1) that three additional Chapter 7 cases, Nos. 04–32328, 04–32423, and 04–32550, filed by *pro se* Debtors between April 9, 2004, and May 13, 2004, utilizing the bankruptcy document preparation services of Ms. Motley would be jointly administered for procedural purposes only with the eight original cases;[8] (2) that the April 9, 2004 Order was deemed to include within its terms the three new cases; (3) that Ms. Motley would have through May 31, 2004, to file the affidavit and documents required pursuant to the April 9, 2004 Order for the three additional cases;[9] (4) that the clerk was to set up an exhibit folder and label the documents filed on May 6, 2004, together with the documents to be filed in the three new cases in the manner set forth in the Order; (5) that Ms. Motley was to supplement her original Affidavits by May 31, 2004, to include the time she and Ms. Silas spent preparing each of the eleven cases together with a statement of the hourly rates charged to the Debtors; (6) that the May 13, 2004 hearing was continued to July 13, 2004; (7) that Ms. Motley was to appear on July 13, 2004, to show cause why the court should not find that certain acts specifically enumerated in the May 17, 2004 Order did not constitute violations of 11 U.S.C.A. § 110, including why certain acts should not be found by the court to constitute the unauthorized practice of law; and (8) why a fine should not be imposed against her in each case and/or why she should not be enjoined from engaging in the acts described in the Order. Additionally, the May 17, 2004 Order allowed Ms. Motley thirty days within which to file a response to the court's directives and instructed that any brief would be due at least seven days prior to the July 13, 2004 evidentiary hearing.

Pursuant to the May 17, 2004 Order, Ms. Motley filed a Supplemental Affidavit in each of the eleven bankruptcy cases on June 2, 2004, in which she provided the court with the estimated time that she and Ms. Silas spent in the preparation of customers' bankruptcy documents. Thereafter, on June 9, 2004, Ms. Motley filed her Objection, in which she objects to and questions the bankruptcy court's authority to impose a fine or issue an injunction against her for any potential violations of § 110, and in which she avers that she is entitled to a jury trial on the issues of the propriety and/or imposition of fines against her under § 110. Ms. Motley filed her Motion for Certification on July 7, 2004, requesting that the bankruptcy court certi-

---

8. Subsequent to the entry of the May 17, 2004 Order, and as of August 17, 2004, nineteen new cases have been filed by *pro se* Debtors utilizing Ms. Motley's bankruptcy petition preparer services. These cases remain outside the scope of the May 17, 2004 Order and were not part of the July 13, 2004 hearing. They are, accordingly, not dealt with in this Memorandum.

9. Ms. Motley was directed to file the previously required documents in the three new cases only if those documents differed from the ones she had already filed in the eight original cases on May 6, 2004. Ms. Motley did not file any additional documents, testifying that she was unable to locate the Customer Information Workbooks prepared by the Debtors in the three additional cases, but stating that they would have been the same documents supplied in the prior eight cases. Additionally, in her Supplemental Affidavits filed on June 2, 2004, Ms. Motley instructed the court that there was "no significant variation between the conduct described by that information and the conduct relevant to the last three of the eleven above-captioned cases." SUPP. AFF. K. MOTLEY, at ¶ 4.

fy the question of whether she has engaged in the unauthorized practice of law to the Tennessee Supreme Court. She also filed the Respondent, Kristin Motley's, Brief With Respect to the Matter of the Unauthorized Practice of Law on July 7, 2004.

On July 13, 2004, the court held the evidentiary hearing concerning the Show Cause Orders. Prior to any proof, the court reiterated that the issues involved were (1) whether the fees charged to and paid by the Debtors for Ms. Motley's "document preparation services" were excessive and, pursuant to § 110(h)(2), should be disallowed and disgorged; (2) whether Ms. Motley's actions concerning the Debtors in these eleven cases constituted the unauthorized practice of law in violation of § 110(k) and Tennessee law; (3) whether Ms. Motley was subject to any of the statutory fines contained within § 110 for any violations thereof; and (4) in the event that the court found her to have violated § 110, why Ms. Motley should not be enjoined from committing further violations.

## II

### 11 U.S.C.A. § 110

■ The Bankruptcy Code allows nonattorneys to prepare bankruptcy documents for debtors subject to the strict requirements of 11 U.S.C.A. § 110, which provides, in its entirety:

(a) In this section—

(1) "bankruptcy petition preparer" means a person, other than an attorney or an employee of an attorney, who prepares for compensation a document for filing; and

(2) "document for filing" means a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under this title.

(b)(1) A bankruptcy petition preparer who prepares a document for filing shall sign the document and print on the document the preparer's name and address.

(2) A bankruptcy petition preparer who fails to comply with paragraph (1) may be fined not more than $500 for each such failure unless the failure is due to reasonable cause.

(c)(1) A bankruptcy petition preparer who prepares a document for filing shall place on the document, after the preparer's signature, an identifying number that identifies individuals who prepared the document.

(2) For the purposes of this section, the identifying number of a bankruptcy petition preparer shall be the Social Security account number of each individual who prepared the document or assisted in its preparation.

(3) A bankruptcy petition preparer who fails to comply with paragraph (1) may be fined not more than $500 for each such failure unless the failure is due to reasonable cause.

(d)(1) A bankruptcy petition preparer shall, not later than the time at which a document for filing is presented for the debtor's signature, furnish to the debtor a copy of the document.

(2) A bankruptcy petition preparer who fails to comply with paragraph (1) may be fined not more than $500 for each such failure unless the failure is due to reasonable cause.

(e)(1) A bankruptcy petition preparer shall not execute any document on behalf of a debtor.

(2) A bankruptcy petition preparer may be fined not more than $500 for each document executed in violation of paragraph (1).

(f)(1) A bankruptcy petition preparer shall not use the word "legal" or any similar term in any advertisements, or advertise under any category that includes the word "legal" or any similar term.

(2) A bankruptcy petition preparer shall be fined not more than $500 for each violation of paragraph (1).

(g)(1) A bankruptcy petition preparer shall not collect or receive any payment from the debtor or on behalf of the debtor for the court fees in connection with filing the petition.

(2) A bankruptcy petition preparer shall be fined not more than $500 for each violation of paragraph (1).

(h)(1) Within 10 days after the date of the filing of a petition, a bankruptcy petition preparer shall file a declaration under penalty of perjury disclosing any fee received from or on behalf of the debtor within 12 months immediately prior to the filing of the case, and any unpaid fee charged to the debtor.

(2) The court shall disallow and order the immediate turnover to the bankruptcy trustee of any fee referred to in paragraph (1) found to be in excess of the value of services rendered for the documents prepared. An individual debtor may exempt any funds so recovered under section 522(b).

(3) The debtor, the trustee, a creditor, or the United States trustee may file a motion for an order under paragraph (2).

(4) A bankruptcy petition preparer shall be fined not more than $500 for each failure to comply with a court order to turn over funds within 30 days of service of such order.

(i)(1) If a bankruptcy case or related proceeding is dismissed because of the failure to file bankruptcy papers, including papers specified in section 521(1) of this title, the negligence or intentional disregard of this title or the Federal Rules of Bankruptcy Procedure by a bankruptcy petition preparer, or if a bankruptcy petition preparer violates this section or commits any fraudulent, unfair, or deceptive act, the bankruptcy court shall certify that fact to the district court, and the district court, on motion of the debtor, the trustee, or a creditor and after a hearing, shall order the bankruptcy petition preparer to pay to the debtor—

(A) the debtor's actual damages;

(B) the greater of—

(i) $2,000; or

(ii) twice the amount paid by the debtor to the bankruptcy petition preparer for the preparer's services; and

(C) reasonable attorneys' fees and costs in moving for damages under this subsection.

(2) If the trustee or creditor moves for damages on behalf of the debtor under this subsection, the bankruptcy petition preparer shall be ordered to pay the movant the additional amount of $1,000 plus reasonable attorneys' fees and costs incurred.

(j)(1) A debtor for whom a bankruptcy petition preparer has prepared a document for filing, the trustee, a creditor, or the United States trustee in the district in which the bankruptcy petition preparer resides, has conducted business, or the United States trustee in any other district in which the debtor resides may bring a civil action to enjoin a bankruptcy petition preparer from engaging in any conduct in violation of this section or from further acting as a bankruptcy petition preparer.

(2)(A) In an action under paragraph (1), if the court finds that—

(i) a bankruptcy petition preparer has—

(I) engaged in conduct in violation of this section or of any provision of this title a violation of which subjects a person to criminal penalty;

(II) misrepresented the preparer's experience or education as a bankruptcy petition preparer; or

(III) engaged in any other fraudulent, unfair, or deceptive conduct; and

(ii) injunctive relief is appropriate to prevent the recurrence of such conduct,

the court may enjoin the bankruptcy petition preparer from engaging in such conduct.

(B) If the court finds that a bankruptcy petition preparer has continually engaged in conduct described in subclause (I), (II), or (III) of clause (i) and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of this title, or has not paid a penalty imposed under this section, the court may enjoin the person from acting as a bankruptcy petition preparer.

(3) The court shall award to a debtor, trustee, or creditor that brings a successful action under this subsection reasonable attorney's fees and costs of the action, to be paid by the bankruptcy petition preparer.

(k) Nothing in this section shall be construed to permit activities that are otherwise prohibited by law, including rules and laws that prohibit the unauthorized practice of law.

11 U.S.C.A. § 110 (footnote omitted).

■■■ Congress enacted § 110 as part of the Bankruptcy Reform Act of 1994 to set standards for and protect consumers from abuses by non-attorney bankruptcy petition preparers. *Brown v. State Bar of Ariz. (In re Bankr.Pet. Preparers Who Are Not Certified Pursuant to Reqs. of the Ariz. Supreme Ct.)*, 307 B.R. 134, 142 (9th Cir. BAP 2004). The purpose was not to establish or create a new profession, nor was it enacted to prevent non-attorneys from offering bankruptcy document preparation services. *See In re Guttierez*, 248 B.R. 287, 297 (Bankr.W.D.Tex.2000); *In re Schneider*, 271 B.R. 761, 764 (Bankr.D.Vt. 2002). Instead, Congress recognized the reality that debtors sought assistance in document preparation from non-attorneys, and "[r]ather than prohibiting such assistance and, as a realistic matter, watching it flourish more dangerously underground, Congress chose to force it into the light by defining persons who provide such assistance and regulating their conduct in ... § 110." *In re Alexander*, 284 B.R. 626, 630 (Bankr.N.D.Ohio 2002).

■■■ With these realities at hand, the primary focus of § 110 was the provision of "a remedy against a growing number of non-attorneys who were rendering quasi-legal (and legal) services in bankruptcy cases to the detriment of both the bankruptcy system and the consuming public." *Guttierez*, 248 B.R. at 297 [10]; *see also Scott*

10. The *Guttierez* court quoted the following excerpt from the House Judiciary Committee's Report:

Bankruptcy petition preparers not employed or supervised by any attorney have proliferated across the country. While it is permissible for a petition preparer to provide services solely limited to typing, far too many of them also attempt to provide legal advice and legal services to debtors. These preparers often lack the necessary legal training and ethics regulation to provide such services in an adequate and appropriate manner. These services may take unfair advantage of persons who are ignorant of their rights both inside and outside the bankruptcy system.

*v. United States Tr. (In re Doser)*, 292 B.R. 652, 656 (D.Idaho 2003) ("Congress enacted § 110 as a consumer protection statute to protect individuals from fraudulent and deceptive conduct by Bankruptcy Petition Preparers[.]"); *Schneider*, 271 B.R. at 763–64 ("[Section 110] was enacted by Congress to control the proliferation of bankruptcy typing services and to protect the public from [preparers] who fraudulently or negligently prepare bankruptcy petitions."). Correspondingly, courts require strict compliance with § 110 in order to " 'create a paper trail to identify non-attorneys who prepare documents to be filed by bankruptcy debtors.' " *Guttierez*, 248 B.R. at 293 (quoting 2 Collier on Bankruptcy ¶ 110.01 (Lawrence P. King ed., 15th ed. rev.1998)).

▬▬▬ In furtherance of its intended consumer protection focus on protecting "persons who are ignorant of their rights both inside and outside the bankruptcy system" from being taken advantage of by non-attorney bankruptcy petitioner preparers, Congress authorized the imposition of statutory fines that cannot exceed $500.00 for any of the specified violations of § 110. H.R. Rep. 103–394, 103rd Cong. (1994), U.S.Code Cong. & Admin.News 1994, p. 3340. Through this authorization, Congress not only allows but urges bankruptcy courts to invoke their authority in upholding § 110's express provisions by imposing these statutory fines.[11] Nevertheless, these fines are discretionary, are limited to $500.00 per violation, and may be alleviated if the court finds reasonable cause for the violation, based upon a totality of the circumstances. *See, e.g.,* 11 U.S.C.A. § 110(b)(2) ("A bankruptcy petition preparer who fails to comply with paragraph (1) *may* be fined not more than $500 for each such failure *unless the failure is due to reasonable cause.*") (emphasis supplied); *accord Marshall v. Bourque (In re Hartman)*, 208 B.R. 768, 779 (Bankr.D.Mass.1997) ("The use of the word 'may' indicates that the appropriate sanction is within the discretion of the court.").

*Guttierez*, 248 B.R. at 297 (quoting H.R. Rep. 103–834, 103rd Cong., 2nd Sess. 40–41 (Oct. 4, 1994) and 140 Cong. Rec. H10770 (Oct. 4, 1994)).

11. Furthermore, through Section 105(a), which provides the court with its inherent powers, Congress has imposed a duty upon the court to uphold the provisions of the Bankruptcy Code, defining the court's power as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C.A. § 105(a) (West 1993); *see also United States Trustee v. Tank (In re Stacy)*, 193 B.R. 31, 38 (Bankr.D.Or.1996) ("Federal courts, including bankruptcy courts, have inherent authority to regulate practice in cases pending before them.").

" 'The basic purpose of section 105 is to [provide] the bankruptcy courts [with the] power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction.' " *Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 336 (2d Cir.1999) (quoting 2 Collier on Bankruptcy ¶ 105–5 to – 7 (Lawrence P. King ed., 15th ed.1999)). On the other hand, § 105(a) is not without limits, may not be used to circumvent the Bankruptcy Code, and does not create a private cause of action unless it is invoked in connection with another section of the Bankruptcy Code. *See Doser*, 292 B.R. at 659; *Greenblatt v. Richard Potasky Jeweler, Inc. (In re Richard Potasky Jeweler, Inc.)*, 222 B.R. 816, 829 (S.D.Ohio 1998); *Yancey v. Citifinancial, Inc. (In re Yancey)*, 301 B.R. 861, 868 (Bankr. W.D.Tenn.2003). Here, § 110 is that sister section.

## A

### Jurisdiction of the Bankruptcy Court

In her Objection, Ms. Motley questions the bankruptcy court's jurisdiction and authority to impose fines upon her, issue an injunction against her, and/or enter a final order concerning any matter under § 110. She bases this presumption upon the language of § 110(i)(1), arguing that the bankruptcy court is required to certify proposed findings of fact to the district court for a de novo hearing and determination as to whether § 110 was violated, whether fines may be imposed, and/or whether an injunction should be issued.

■■■ Jurisdiction over bankruptcy matters is exclusive to the federal district courts pursuant to 28 U.S.C.A. § 1334, which provides, as follows:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

(d) Any decision to abstain or not to abstain made under this subsection (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

(e) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

28 U.S.C.A. § 1334 (West 1993 & Supp. 2004) (footnote omitted). Section 1334 is supplemented by 28 U.S.C.A. § 157, which confers jurisdiction over bankruptcy matters upon bankruptcy judges as follows:

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments . . . .

(2) Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate; [and]

. . . .

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C.A. § 157(a), (b) (West 1993). On July 11, 1984, the United States District Court for the Eastern District of Tennessee entered a Standing Order referring all bankruptcy matters to the bankruptcy judges for the Eastern District of Tennessee, as directed by § 157(a).

■ The court agrees with Ms. Motley's argument that the language of § 110(i)(1) applies to § 110 in its entirety, and not simply to subsection (i). *Accord In re Vleck,* 307 B.R. 615, 616 (Bankr. N.D.Ill.2004); *Fessenden v. Ireland (In re Hobbs),* 213 B.R. 207, 218 n. 24 (Bankr. D.Me.1997). Nevertheless, the court disagrees with Ms. Motley's arguments that it does not possess the authority to determine whether she has violated § 110, to assess the statutory fines contained therein, and/or to issue an injunction prohibiting future conduct resulting in further violations of § 110. The court believes that Ms. Motley's argument ignores not only the terms of the Show Cause Orders, but also the plain language of § 110, and the essence of bankruptcy jurisdiction.

■ Quite clearly, the provisions of § 110 cannot be triggered absent a case arising under title 11. Additionally, "[t]here can be no more fundamental exercise of core subject matter jurisdiction by the bankruptcy court than its policing of professionals whom debtors pay to render service in connection with their cases."

*McDow v. We the People Forms & Serv. Ctrs., Inc. (In re Douglas),* 304 B.R. 223, 232 (Bankr.D.Md.2003); *see also Taub v. Weber,* 366 F.3d 966, 968 (9th Cir.2004) ("Bankruptcy courts have the power to regulate the activities of bankruptcy petition preparers under 11 U.S.C. § 110."); *In re Moore,* 283 B.R. 852, 857 (Bankr. E.D.N.C.2002) ("[B]ecause the petition and schedules are at the heart of the bankruptcy process, matters attendant to [their] preparation are 'core' proceedings."); *Robiner v. Home Owners Rescue Serv. (In re Webb),* 227 B.R. 494, 497 (Bankr.S.D.Ohio 1998) (finding that actions under § 110 are core, arise directly under title 11, and directly affect the administration of a debtor's bankruptcy estate). Accordingly, the court is convinced that it is authorized to hear and adjudicate matters concerning § 110 and any violations thereof.

■ Furthermore, the court is within its authority under § 110 to impose the statutory fines therein and/or enjoin bankruptcy petition preparers from violating § 110. The court acknowledges that "[i]n § 110(i), Congress precluded the bankruptcy court from imposing the remedies prescribed in that section and, instead, required that pertinent facts be certified to the district court, which court then must hold a hearing and address the § 110(i) remedies." *Demos v. Brown (In re Graves),* 279 B.R. 266, 271 (9th Cir. BAP 2002) (citing 11 U.S.C.A. § 110(i)). Nevertheless, the prohibited actions addressed in § 110(b) through (h) have their own sections concerning the appropriate statutory fines.

■ After carefully reviewing the statute itself, along with the case law concerning this issue, the court finds that the remedies set forth in § 110(i) are supplemental to the statutory remedies set forth in other subsections of § 110, allowing debtors and/or their estates to be compen-

sated when the court finds that they have been harmed by a bankruptcy petition preparer's engagement in "fraudulent, unfair, or deceptive practices," any negligent or intentional disregard by the bankruptcy petition preparer of the Bankruptcy Code and/or the Bankruptcy Rules, and/or their cases have been dismissed for failure to file documents required by the Bankruptcy Code. *See* 11 U.S.C.A. § 110(i); *In re France*, 271 B.R. 748, 756 (Bankr.E.D.N.Y. 2002) ("Bankruptcy courts may impose statutory fines of up to $500 for each specific violation and the District Court awards further relief upon request of the debtor, the trustee, or a creditor under Section 110(i)."); *In re Heck*, No. 00–12048–JMB, 2000 Bankr.LEXIS 1803, at *5 & n. 1, 2000 WL 33679398, at *2 & n. 1 (Bankr.D.N.H. Nov.28, 2000) (holding that "violations of the requirements of subsections (b) through (g) are punishable by a fine of not more than $500 for each such violation pursuant to an order of this Court" and "[i]f a petition preparer violates any provision of section 110, the Court may certify such fact to the district court under section 110(i)(1).").

■■■ Likewise, § 110(j) expressly allows the court to enjoin bankruptcy petition preparers "from engaging in any conduct in violation of this section or from further acting as a bankruptcy petition preparer." 11 U.S.C.A. § 110(j)(1).

Congress did not prescribe such a procedure for the six subsections of § 110 that authorize fines and, likewise, said nothing about involving the district court in § 110(j) injunctions. The specificity of the § 110(i) requirement for the district court to impose that subsection's remedies suggests that the bankruptcy court is authorized to impose all other remedies under § 110, including

§ 110(b)—(h) fines and § 110(j) injunctions.

*Graves*, 279 B.R. at 271; *see also In re Moore*, 290 B.R. 287, 292–93 (Bankr. E.D.N.C.2003) (finding that the bankruptcy court has the authority to issue injunctive relief pursuant to § 110(j)); *In re Doser*, 281 B.R. 292, 312–13 (Bankr.D.Idaho 2002) ("The Bankruptcy Code provides that this Court may impose sanctions and may issue an injunction against a BPP in response to conduct found to violate § 110. The Court may also, in an appropriate case, certify the matter to the district court for a determination of damages."); *United States v. Summerrain (In re Avery)*, 280 B.R. 523, 525–26 (Bankr. D.Colo.2002) (holding that the bankruptcy court "has authority to directly impose fines for violation of [§ 110(b), (c), (d), (f), and (g)] without certification to the District Court."); *In re Moffett*, 263 B.R. 805, 812 (Bankr.W.D.Ky.2001) (assessing fines and enjoining future filings, in addition to making a finding of unfair and deceptive practices that would allow the debtor to seek damages from the district court); *In re Gabrielson*, 217 B.R. 819, 822 (Bankr. D.Ariz.1998) ("[T]he request for an injunction is squarely within the parameters of § 110(j)(2) and this Court's jurisdiction. There is no requirement that these issues be certified to the District Court, for instance, as is required under § 110(i)(1).").[12]

At this time, no party has sought compensatory damages against Ms. Motley under § 110(i). Instead, the court was concerned with possible violations of § 110(b)(1), excessive fees under § 110(h)(2), and the potential unauthorized practice of law in violation of § 110(k). On its own motion, the court directed Ms. Motley to appear and show cause why it

---

12. Moreover, § 110(j) authorizes the court to initiate and issue injunctive relief *sua sponte.*

*Doser*, 292 B.R. at 659; *Graves*, 279 B.R. at 272.

should not impose the statutory fines authorized by § 110(b)(2), order disallowance and disgorgement of any excessive fees pursuant to § 110(h)(2), and/or why she should not be enjoined from engaging in further violations of § 110, as authorized by § 110(j). If the court determines that Ms. Motley has engaged in unfair, deceptive, or fraudulent acts, is in violation of § 110 and specifically subsection (i), or if any of the above-captioned Debtors' cases are dismissed due to any violations of § 110, the court will certify facts to the district court for an award of compensatory damages therefor.

Nevertheless, irrespective of the damages available in § 110(i), the statute clearly authorizes the bankruptcy court to (1) make findings that violations of § 110 have occurred and enter final orders accordingly; (2) assess the specified statutory fines for express violations set forth in § 110(b) through (g) up to $500.00 for each violation found; (3) determine if the fees charged by Ms. Motley are excessive and should be disallowed and disgorged pursuant to § 110(h)(2); and (4) by virtue of § 110(j), enjoin a bankruptcy petition preparer from engaging in any conduct resulting in further violations of any subsection of § 110. *See Douglas,* 304 B.R. at 231 ("By enacting Section 110 of the Bankruptcy Code, Congress unequivocally conferred upon the bankruptcy courts the power to enforce the strictures of the statute."). At that point, the court will certify its findings of violations, as well as any findings of unfair, deceptive, or fraudulent acts by a bankruptcy petition preparer to the United States District Court for the Eastern District of Tennessee for the sole purpose of allowing the affected debtor(s), any creditor thereof, or the trustee to seek compensatory damages as set forth in § 110(i), in addition to any previously assessed statutory fines allowed by § 110(b) through (g).

## B

### Congressional Authority to Enact § 110 Under the Bankruptcy Clause

In her Post–Trial Brief, Ms. Motley argues, for the first time, that the bankruptcy court does not have subject matter jurisdiction in this matter because Congress acted outside its scope of authority under the Bankruptcy Clause when it enacted § 110. Ms. Motley avers that the Supreme Court's decision in *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), expressly limited Congressional power under the Bankruptcy Clause to matters concerning the restructuring of the debtor-creditor relationship, and therefore, since that relationship occurs after the actions implicated by § 110, the statute is an invalid exercise of Congressional authority.

Article I of the United States Constitution defines the powers given to Congress. The Bankruptcy Clause, located within Section 8 of Article I, authorizes Congress "[t]o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4. Section 8 of Article I also grants Congress the authority to impose and collect taxes, borrow money, regulate commerce, coin money, punish counterfeiters, establish post offices, post roads, regulate patents and copyrights, create courts inferior to the Supreme Court, punish piracy, declare war, raise and support armed forces, implement the draft, govern cessation. *See* U.S. CONST. art. I, § 8, cl. 1 through cl.17. Finally, Congress has been granted the authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or

Officer thereof." U.S. CONST. art. I, § 8, cl. 18.

In *Marathon*, the Supreme Court examined the authority granted to bankruptcy courts under 28 U.S.C.A. § 1471 (repealed 1984), which was enacted in conjunction with the Bankruptcy Act of 1978, to hear all civil actions arising under, in, or related to a debtor's bankruptcy case. Holding that non-Article III courts could not be given such broad and plenary jurisdiction, the Court held that § 1471 was unconstitutional. *Marathon*, 102 S.Ct. at 2880. As a result of the *Marathon* decision, Congress enacted the current scheme through which bankruptcy courts have been granted jurisdiction over bankruptcy matters, as previously discussed.

Ms. Motley argues that the Court

distilled the essence of [Congressional authority to establish uniform bankruptcy laws] by observing that "the restructuring of debtor-creditor relations ... is at the core of the federal bankruptcy power ..." As the Supreme Court's most recent and definitive pronouncement with respect to the meaning and scope of the Bankruptcy Clause, it now virtually is impossible to rationalize ... § 110 as being within the compass of that Clause; i.e., related to the restruc-

turing of the debtor-creditor relationship.

POST–TRIAL BRIEF, at p. 25 (footnote omitted). The *Marathon* case does not, however, limit Congressional ability to establish uniform bankruptcy laws to "the restructuring of debtor-creditor relations" as Ms. Motley argues. In the Court's analysis as to the constitutionality of § 1471, it examined private rights versus public rights, and noted that

Appellants argue that a discharge in bankruptcy is indeed a "public right," similar to such congressionally created benefits as "radio station licenses, pilot licenses, or certificates for common carriers" granted by administrative agencies. But the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not.

*Marathon*, 102 S.Ct. at 2871 (internal citations omitted). However, contrary to Ms. Motley's averments otherwise, nowhere in *Marathon* does the Supreme Court expressly limit Congressional authority under the Bankruptcy Clause to the restructuring of the debtor-creditor relationship.[13]

---

13. By way of example, Ms. Motley compares the limitations imposed under Article I to the ability of Congress to abrogate sovereign immunity under the Eleventh Amendment in bankruptcy cases, citing *Seminole Tribe v. Fla.*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). This comparison, however, is misplaced. Ms. Motley incorrectly states that in *Seminole Tribe*, "the Supreme Court found Congress not to have authority under the Bankruptcy Clause to deprive a State of its sovereign immunity." POST–TRIAL BRIEF, at p. 30. *Seminole Tribe*, in which the Court stated that Article 1 could not circumvent the Constitution, concerned the Commerce Clause, and the only bankruptcy refer-

ence was in a footnote that stated "it has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity." *Seminole Tribe*, 116 S.Ct. at 1131 n. 16. To date, Congress has not made an express determination as to the Article 1 limits placed on Congress concerning the Bankruptcy Clause.

Ms. Motley also relies upon *Coan v. Bernier (In re Bernier)*, 176 B.R. 976 (Bankr.D.Conn. 1995), in which the court examined the scope of the Bankruptcy Clause in upholding 11 U.S.C.A. § 363(h) (West 1993). The court finds nothing within the *Bernier* opinion to persuade it that Congress was not authorized

Discharge accomplishes one of the Bankruptcy Code's key goals of enabling "honest but unfortunate" debtors to obtain relief from their debts in order to make "a fresh start." *In re Williams*, 291 B.R. 445, 446 (Bankr.E.D.Tenn.2003) (quoting *In re Krohn*, 886 F.2d 123, 125 (6th Cir.1989)) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). A Chapter 7 bankruptcy case "is commenced by the filing with the bankruptcy court of a petition ... [which] constitutes an order for relief[.]" 11 U.S.C.A. § 301 (West 1993); FED. R. BANKR. P. 1002(a). Accordingly, in order to receive a discharge of debts, a debtor must file a petition, along with statements and schedules, and pay a filing fee. *See* FED. R. BANKR. P. 1002(a); FED. R. BANKR. P. 1006(a); FED. R. BANKR. P. 1007.

Section 110 addresses the actions of bankruptcy petition preparers with respect to each of these actions necessary for the commencement of a debtor's bankruptcy case. Failure to comply with any of these specific requirements will result in the dismissal of the case, sans the benefit of a discharge. Without the filing of the petition and other bankruptcy documents, no debtor-creditor relationship will exist, and thus, Ms. Motley's argument that § 110 does not fall within the ambit of the debtor-creditor relationship is without merit. *See also Moore*, 283 B.R. at 857 ("The petition has everything to do with the administration of a bankruptcy estate[,] ... is essential to the proper operation of the bankruptcy process, and all parties suffer if a petition is improperly prepared.").

Furthermore, the regulation of persons assisting individuals who become debtors falls squarely within the scope of the Bankruptcy Clause and its directive to establish uniform laws on the subject of bankruptcies. Clearly, the Bankruptcy Clause authorizes Congress to establish laws governing the conduct of attorneys who file bankruptcy documents commencing bankruptcy cases for debtors. *See, e.g.*, 11 U.S.C.A. § 327 (West 1993) (concerning the employment of professionals). By enacting § 110, Congress brought bankruptcy petition preparers directly under the jurisdiction of the bankruptcy courts, requiring them to be held to certain standards that they otherwise would not be subject to. *See Douglas*, 304 B.R. at 237 n. 6 ("It is precisely because petition preparers do not come to court and often perform their services anonymously that the statute was enacted to bring them out of the shadows and into the full view and vicarious presence of the Court."). This Congress is undoubtedly authorized to do under the Bankruptcy Clause.

Likewise, Congress possessed the authority under the Commerce Clause, Art. I, § 8, cl. 3, to enact § 110. As previously discussed, Congress enacted § 110 as a consumer protection statute, to keep unsophisticated persons from being taken advantage of by unregulated and untrained bankruptcy petition preparers. *See Douglas*, 304 B.R. at 236 ("The statutory purpose behind the enactment of Section 110, as revealed in its legislative history, was to address a problem perceived by Congress to be detrimental to the proper administration of the bankruptcy system, namely the lack of standards for and the unregulated practices of bankruptcy petition preparers."). In fact, the Supreme Court has upheld consumer protection statutes under the Commerce Clause. *See, e.g., Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (concerning loan-sharking prohibitions under the Consumer Protection Act).

to enact § 110 pursuant to the Bankruptcy Clause.

Section 110 is a valid exercise of Congressional authority pursuant to the Bankruptcy Clause and the Commerce Clause. Accordingly, Ms. Motley's constitutional challenge thereto on this basis must fail.[14]

## C

### Challenges That § 110 is Vague and Overbroad

Ms. Motley also argues, for the first time in her Post–Trial Brief, that § 110(h), (i), and (j) are vague and overbroad, thus violating her due process and First Amendment rights. She avers that subsection (h), in particular, does not provide bankruptcy petition preparers with notice as to what constitutes an excessive fee, explain what services are allowable within that fee, or offer a standard by which to compare what is excessive. With regards to subsection (i), Ms. Motley argues that it does not identify its proscribed practices. Finally, Ms. Motley argues that subsection (j) does not provide guidance as to what conduct is implicated thereunder, other than referencing conduct identified in subsections (b) through (g). As for her argument that these subsections are overbroad, Ms. Motley merely states that § 110 "infringes upon [her] rights to free speech under the First Amendment." Post–Trial Brief, at p. 34.[15]

▄▄▄▄ The Supreme Court has given the following instructions concerning vagueness:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (footnotes omitted). The Court has also held that

These standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow[.] ... The Court has also expressed greater tolerance of enactments

14. Other courts faced with these same challenges have likewise rejected it. *See Doser*, 292 B.R. at 656–57; *Douglas*, 304 B.R. at 236–37; *Moore*, 283 B.R. at 857. The court notes that Ms. Motley's counsel in these matters was the attorney of record for the We the People franchiser in the *Doser* case, and he delivered oral argument for We the People in the *Douglas* case. As stated in *Douglas*, "[t]he constitutionality and enforceability of Section 110 have been upheld by every court

that has been called upon the decide the issue." *Douglas*, 304 B.R. at 238.

15. Ms. Motley's Post–Trial Brief offered no legal argument to support this statement. In addition, this one-sentence averment in her Post–Trial Brief has a footnote that does not correspond to its referenced *infra* citation, leading the court to believe that this sentence was inadvertently transferred from another document in another case.

with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (footnotes omitted).

██ The court finds that § 110 is not constitutionally vague, such that "a person of ordinary intelligence would [not] have fair notice of what conduct was forbidden[.]" *Doser,* 292 B.R. at 658. The statute defines the term "bankruptcy petition preparer" as being a person, other than an attorney, who gets paid to prepare documents for filing with the bankruptcy court. It then defines "document for filing" as meaning a debtor's voluntary petition and/or any other document filed in the bankruptcy court by a debtor. The statute clearly advises bankruptcy petition preparers that they must sign all documents they've prepared, give their address and social security number, furnish a copy of any document prepared to the debtor, and file with the court a declaration of fees received. Section § 110 also prohibits a bankruptcy petition preparer from executing documents for a debtor, using the word "legal" in advertising, and taking any filing fee from a debtor.

Admittedly, subsection (h), which allows the court to disallow "any fee ... found to be in excess of the value of services rendered for the documents prepared[,]" does not define what fee is reasonable. 11 U.S.C.A. § 110(h)(2). Such a standard is nevertheless understandable, considering that the circumstances of compensation may vary based upon the facts of a particular case, the actual time involved, or the length of the documents prepared, and because allowance of compensation is fully within the discretion of the court. More-

over, this comports with the allowance of compensation for attorneys, trustees, accountants, and other professionals employed pursuant to the Bankruptcy Code, whereby the court may award "reasonable compensation for actual, necessary services rendered by ... the professional person[.]" 11 U.S.C.A. § 330(a)(1)(A) (West 1993 & Supp.2004).

Likewise, Ms. Motley's argument that subsection (i) is vague because it does not identify the proscribed conduct must fail. The court does not believe that an ordinary layperson cannot deduce the meaning of subsection (i) or understand the consequences thereof. It provides the opportunity for a debtor, the trustee, or a creditor to collect damages for any of the following actions concerning a case in which a bankruptcy petition preparer was involved: (1) dismissal of the case for failure to file necessary documents; (2) a bankruptcy petition preparer's negligent or intentional disregard of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure; (3) violation of any portion of § 110; or (4) any fraudulent, unfair, or deceptive act committed by the bankruptcy petition preparer. Furthermore, although the statute does not expressly state what conduct should be considered as fraudulent, unfair, or deceptive, those terms are unambiguous and are readily understandable by an ordinary layperson.

██ Ms. Motley's vagueness argument concerning subsection (j) is additionally without merit. In its most literal interpretation, the wording of § 110(j)(2)(A) expressly denotes the conduct for which an injunction may be warranted. The statute first includes conduct found to violate "this section," which applies to § 110, as a whole.[16] It then includes conduct violating "any provision of this title a violation of

---

16. *See* discussion in Section A, at p. 20, *supra.*

which subjects a person to criminal penalty." 11 U.S.C.A. § 110(j)(2)(A)(i)(I).[17] The court may also issue an injunction if the bankruptcy petition preparer has misrepresented his or her experience and/or education, and if he or she has engaged in any other fraudulent, deceptive, or unfair conduct pursuant to § 110(j)(2)(A)(i)(II) and (III). The court fails to see how the statute could more clearly define the conduct that Congress intended to cover short of listing every possible scenario that could be imagined.

Additionally, Ms. Motley's argument that she has been denied due process must fail. Ms. Motley was given not only adequate notice that the possibility of sanctions existed, but also an opportunity to show the court why they should not be imposed. The May 17, 2004 Order expressly states that she may be subject to the statutory fines set forth in § 110, as well as injunctive relief. The bankruptcy court has the discretion to issue such orders, and if necessary, to impose the statutory violations set forth in § 110 pursuant to its inherent powers under § 105(a). *See also Brown,* 307 B.R. at 143–44.

In a similar vein, Ms. Motley's challenges that § 110 is overbroad must also fail. With regards to a challenge that a statute is constitutionally overbroad, the Supreme Court has held, as follows:

> to prevail on a facial attack the plaintiff must demonstrate that the challenged law either "could never be applied in a valid manner" or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it "may inhibit the constitutionally protected speech of third parties." Properly understood, the latter kind of facial challenge is an exception to ordinary standing requirements, and is justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power. Both exceptions, however, are narrow ones: the first kind of facial challenge will not succeed unless the court finds that "every application of the statute created an impermissible risk of suppression of ideas," and the second kind of facial challenge will not succeed unless the statute is "substantially"

17. Of course, the term "this title" refers to title 11 of the United States Code, in its entirety. Congress has determined that certain conduct in violation of the Bankruptcy Code is punishable by a criminal penalty of either fines, imprisonment, or both. *See generally,* 18 U.S.C.A. § 151 through 157 (West 2000). Examples of actionable conduct include, among others, concealment of assets, false oaths, embezzlement, misconduct by estate officers, and bankruptcy fraud.

Specifically, in connection with § 110, Congress enacted 18 U.S.C.A. § 156, entitled "Knowing disregard of bankruptcy law or rule," which states as follows:

(a) Definitions.—In this section—

"bankruptcy petition preparer" means a person, other than the debtor's attorney or an employee of such an attorney, who prepares for compensation a document for filing.

"document for filing" means a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under this title.

(b) Offense.—If a bankruptcy case or related proceeding is dismissed because of a knowing attempt by a bankruptcy petition preparer in any manner to disregard the requirements of title 11, United States Code, or the Federal Rules of Bankruptcy Procedure, the bankruptcy petition preparer shall be fined under this title, imprisoned not more than 1 year, or both.

18 U.S.C.A. § 156. This United States Code section is referenced on every document that all bankruptcy petition preparers, including Ms. Motley, must sign.

overbroad, which requires the court to find "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court."

N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 2125 & n. 15, 2126, 80 L.Ed.2d 772 (1984)) (internal citations omitted). "The scope of the First Amendment overbreadth doctrine, like most exceptions to established principles, must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted." N.Y. v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982). "In the case of a statute where 'despite some possibly impermissible application, the remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct[,]' the Court will not strike the statute for being overbroad." Doser, 292 B.R. at 658 (quoting Sec'y of Md. v. J.H. Munson Co., Inc., 467 U.S. 947, 104 S.Ct. 2839, 2851, 81 L.Ed.2d 786 (1984)).

■ In the present cases, the court finds nothing to support Ms. Motley's allegations that § 110 violates her First Amendment rights and is overbroad. She argues that because individuals have a protected right to represent themselves pro se, she cannot be prohibited from distributing information to assist in that endeavor. Moreover, Ms. Motley contends that the information she presents to customers "is virtually the same type of material sold in bookstores and comparable to that produced and provided by the Administrative Office of United States Courts." However, in making these statements, Ms. Motley has offered no legal argument in support thereof. She has not referenced any rights that have purportedly been violated, nor can the court blindly identify any such violated rights under the First Amendment. Furthermore, these arguments have been rejected by other courts before whom they have been made. Besides, "Ms. [Motley] is not simply distributing or selling information like a bookstore. Instead, [she] is selling her services as a BPP, and in that capacity she distributes a select few pamphlets of information that advise debtors on how to complete a bankruptcy petition." Doser, 292 B.R. at 657 (citing Ferm v. United States Tr. (In re Crowe), 243 B.R. 43, 50 (9th Cir. BAP 2000)); see also In re Kaitangian, 218 B.R. 102, 107–08 (Bankr.S.D.Cal.1998).

Section 110 has been applied in a valid manner by numerous courts since its enactment in 1994. It does not improperly infringe upon any rights afforded to Ms. Motley under the Constitution, and accordingly, Ms. Motley's constitutional challenges that § 110 is vague and overbroad are without merit.

## III

### Applying § 110

■ Before proceeding further, the court must first confirm the applicability of § 110 to Ms. Motley, Ms. Silas, and/or We the People USA.[18] Section 110 applies only to non-attorneys who prepare bankruptcy documents, and by its own terms, the statute covers any person that is not a licensed attorney who types or prepares bankruptcy documentation for a debtor who then

---

**18.** The court acknowledges that neither Ms. Silas nor We the People USA are before the court concerning these matters, as the Show Cause Orders were directed only to Ms. Motley as the bankruptcy petition preparer of record in each of these case. Nevertheless, the court feels that it is important to point out and define the roles played by Ms. Silas and We the People USA in these cases.

files a pro se bankruptcy petition. *See* 11 U.S.C.A. § 110(a)(1), (2). "Person" is a defined term under the Bankruptcy Code which "includes individual[s], partnership[s], and corporation[s]." 11 U.S.C.A. § 101(41) (West 1993 & Supp.2004).

The court finds that Ms. Motley, Ms. Silas, and We the People USA all fit within the statutory definition of bankruptcy petition preparer, and thus, all must comply with the provisions of § 110. Through her own testimony, the court was advised that Ms. Motley, doing business as We the People of Knoxville, meets directly with the customers, has them execute the Bankruptcy Document Preparation Agreement, provides them with the Customer Packet, answers general questions, reviews the completed Workbook for legibility and completeness, reviews the statements and schedules for obtaining the customer's signature, and finalizes the documents for filing. And although she does not actually type in the information received from the customers, she holds herself out to the public as the actual bankruptcy petition preparer, and she retains 75% of the fees that she collects from customers. The court is satisfied that Ms. Motley, both individually and d/b/a We the People of Knoxville, fits within the statutory definition of bankruptcy petition preparer.[19]

In addition, a literal interpretation of the statutory definition of bankruptcy petition preparer convinces the court that We the People USA falls within the category of bankruptcy petition preparer. We the People USA supplies Ms. Motley with the documents that she presents to the customers, actually pays the supervising attorney, and provides Ms. Motley with the services of its typist, Ms. Silas. In exchange for these services, We the People USA receives 25% of Ms. Motley's gross monthly profits. Additionally, We the People USA does not allow Ms. Motley to type petitions herself, nor does it allow her to hire other typists, instead requiring her to use the services of its own typist, Ms. Silas.

Likewise, the court finds that Ms. Silas is also a bankruptcy petition preparer. Ms. Silas is the individual who actually types the information received from Ms. Motley's customers into the Best Case© computer program that compiles the statements and schedules. Ms. Silas then forwards the completed documents from her home in Alaska to Ms. Motley for presentation to the customers. Although Ms. Silas is compensated for her efforts by We the People USA instead of Ms. Motley, she still receives compensation for preparing the customers' bankruptcy documents for filing with the bankruptcy court.[20] Accordingly, the court finds that she, too, meets the statutory definition of a bankruptcy petition preparer under § 110(a).

## IV

### § 110(b)(1)

Subsection (b) requires that all bankruptcy petition preparers must sign the documents that they have prepared for debtors. 11 U.S.C.A. § 110(b)(1). In each debtor's bankruptcy case, the bankruptcy petition preparer is required to sign and file a Certification and Signature of Non–

---

19. Based upon this finding, throughout the remainder of this Memorandum, when the court refers to Ms. Motley, all references mean her both individually and doing business as We the People of Knoxville.

20. Although the court was not presented with evidence as to the amount of compensation that We the People USA pays to Ms. Silas for her services, Ms. Motley did testify that a portion of her 25% fee that she paid to We the People USA each month was applied towards the payment of Ms. Silas's salary.

Attorney Bankruptcy Petition Preparer (Official Form 19)[21] for all documents prepared for and to be filed by the debtor. Additionally, a variation of this certification has been incorporated into the following specific documents, requiring the bankruptcy petition preparer to sign them as well: (1) the Voluntary Petition; (2) the Declaration Concerning Debtor's Schedules as the Non–Attorney Petition Preparer; (3) the Certification and Signature of Non–Attorney Bankruptcy Petition Preparer for each Statement of Financial Affairs; (4) the Statement of Intention; (5) the Application to Pay Filing Fee in Installments; and (6) the Disclosure of Compensation of Bankruptcy Petition Preparer.

■ The failure to comply with this requirement may result in the imposition of fines in an amount up to $500.00 per violation. Moreover, pursuant to 11 U.S.C.A. § 110(b)(2), the court may impose this statutory fine for each separate document that a bankruptcy petition preparer fails to sign, as § 110(a)(2) applies to "the petition and each of the various schedules and statements required of debtors [as] separate documents for purposes of § 110." *Hobbs*, 213 B.R. at 212 ("Requir-

ing petition preparers to sign each separate form recognizes the reality that a debtor's petition, schedules, statements of affairs, and other required documents are not always filed together, or necessarily even filed."); *see also Staiano v. File Aid of N.J. (In re Bradshaw)*, 233 B.R. 315, 326 (Bankr.D.N.J.1999) (agreeing that "petitions, plans, schedules, statements, certifications, motions, and other documents filed in bankruptcy cases are each a separate 'document for filing' for purposes of [§ ] 110."); *Hartman*, 208 B.R. at 777 (holding that each document containing a signature line is separate and therefore, failure to sign them constitutes separate violations of § 110).[22]

■ In the Lynch, Barnette, Sebring, Jackson, Wiley, Richardson, and Hance cases, Ms. Motley executed the following documents as bankruptcy petition preparer: (1) the Voluntary Petition; (2) the Declaration Concerning Debtor's Schedules; (3) the Statement of Financial Affairs[23]; (4) the Disclosure of Compensation evidencing the receipt of $214.00 for each case, for "$199.00 Typing Petition $15.00 Copy Fee;" (5) the Statement of Intention; and (6) the Official Form 19

---

21. All future references to this particular document shall be "Official Form 19 Certification."

22. This interpretation is buttressed by the 1995 Committee Note to the Official Form 19 Certification, which reads as follows:

This form is new. The Bankruptcy Reform Act of 1994 requires a "bankruptcy petition preparer," as defined in 11 U.S.C. § 110, to sign any "document for filing" that the bankruptcy petition preparer prepares for compensation on behalf of a debtor, to disclose on the document certain information, and to provide the debtor with a copy of the document. This form or adaptations of this form have been incorporated into the official forms of the voluntary petition, the schedules, the statement of financial affairs, and other official forms that typically would

be prepared for a debtor by a bankruptcy petition preparer. This form is to be used in connection with any other document that a bankruptcy petition preparer prepares for filing by a debtor in a bankruptcy case. OFFICIAL FORM 19 (COMMITTEE NOTE).

23. The court notes that even though Ms. Motley executed the documents as bankruptcy petition preparer, within the body of each Statement of Financial Affairs, Ms. Motley, individually, is not listed under question 9 concerning payments related to debt counseling or bankruptcy. Instead, We the People—Knoxville and We the People—USA are listed as receiving the $199.00 typing fee and the $15.00 copy fee. *See, e.g.*, TRIAL EX. 10; TRIAL Ex. 11.

Certification. The court finds that she fully complied with § 110(b)(1) in each of these cases. However, in the Rose, Buckner, Steele, and Smith cases, Ms. Motley did not execute the following documents that she was required to sign: (1) the Declaration Concerning Debtor's Schedules; (2) the Statement of Financial Affairs; and (3) the Statement of Intention.[24] Her failure to execute these documents violates § 110(b)(1), exposing her to a potential fine of up to $500.00 for each of the twelve violations.

▇ Additionally, in all eleven cases, Ms. Motley executed the Official Form 19 Certification, acknowledging her role as bankruptcy petition preparer and advising that Ms. Silas also assisted with the preparation of the documents. However, in none of the cases did Ms. Silas sign and file an Official Form 19 Certification, even though the actual documents executed by Ms. Motley expressly state directly above her signature that "[i]f more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person." *See, e.g.,* TRIAL Ex. 10; TRIAL Ex. 11. Likewise, the Instructions for Completing Official Form 19 Certification and Signature of Non–Attorney Bankruptcy Petition Preparer states the following:

## III. DIRECTIONS

10. If more than one person prepared the document for filing by the debtor, the bankruptcy petition preparer also must prepare an Official Form 19 for each person who participated in preparing the document for the debtor, and each additional form must be signed by the individual named on that form.

OFF. FORM 19 (INSTRUCTIONS). These omissions constitute a direct violation of § 110(b)(1) for each document prepared by Ms. Silas for which Ms. Silas did not sign and file an Official Form 19 Certification. Further, Ms. Silas did not execute any of the five other documents requiring a form of the certification in any of the eleven cases, i.e., the Voluntary Petition, the Statement of Financial Affairs, the Statement of Intention, the Declaration Concerning Debtor's Schedules, and the Disclosure of Compensation, even though she is the person who actually typed the documents. This failure is a direct violation of § 110(b)(1), carrying with it as a possible consequence the imposition of statutory fines in an aggregate amount not to exceed $33,000.00.[25]

▇ Even though the court is authorized to impose statutory fines upon Ms. Motley in an aggregate amount up to $6,000.00 for the twelve separate violations of § 110(b)(1), it declines to do so at this time. It appears that Ms. Motley became aware of her omissions following the first four cases, and her quickness in remedying her violations in subsequent filings is not lost upon the court. Nevertheless, this decision does not preclude the court from imposing the maximum $500.00 statutory

---

24. In fact, even though the official forms for each of these documents contains the declaration statement and place for signature, on these twelve individual documents, that section was omitted by Ms. Motley.

25. In making this statement, the court is not implying that Ms. Motley is directly responsible and/or liable for the allowable statutory fines stemming from Ms. Silas's violations and non-compliance with § 110. However, because Ms. Motley, individually and doing business as We the People of Knoxville, is the bankruptcy petition preparer of record in these cases, her failure to ensure Ms. Silas's compliance must be factored into the court's overall determinations. Furthermore, the court once again acknowledges that Ms. Silas, herself, is not presently before the court concerning these matters.

fine per violation in the event that it discovers or is made aware of any future violations of § 110(b) by Ms. Motley.[26] The court also cautions against any continued failure by Ms. Motley to assist Ms. Silas in blatantly violating this subsection.

## V

### Permissible Activities Under § 110

 Another area of concern raised by the court in its Show Cause Orders is the question of whether certain actions and activities performed by Ms. Motley constitute the unauthorized practice of law, in violation of § 110(k), which "makes [it] clear that Section 110 does not permit activities that would be considered unauthorized practice under state law." *In re Moffett,* 263 B.R. 805, 813 (Bankr.W.D.Ky. 2001). However, before deciding whether Ms. Motley has violated § 110(k), the court must answer the initial question of what services Congress envisioned when it enacted § 110 and whether Ms. Motley has exceeded § 110's statutory limitations. Based upon a combination of the statute's plain language, the basic definitions and terms chosen by Congress, and the legislative history, the court is convinced that § 110 limits bankruptcy petition preparers to rendering "only 'scrivening/typing' services" for debtors who then file their petitions pro se. *See Guttierez,* 248 B.R. at 297–98.

As previously discussed, Congress enacted § 110 in order to protect unwitting debtors from being preyed upon by unscrupulous and unregulated document pre-parers. The legislative history expressly states that "[w]hile it is permissible for a petition preparer to provide services solely limited to typing, far too many of them also attempt to provide legal advice and legal services to debtors." *Guttierez,* 248 B.R. at 297 (quoting H.R. REP. 103–834, 103rd Cong., 2nd Sess. 40–41 (Oct. 4, 1994) and 140 Cong. Rec. H10770 (Oct. 4, 1994), U.S.Code Cong. & Admin.News 1994, pp. 3340, 3365). Similarly, all references within the statute itself refer to the preparation of documents for filing. Other than the actual filing-in of the documents themselves, the court cannot envision what else Congress could have intended by the use of these terms.

Additionally, the majority of courts previously confronted with this issue agree that "[t]he only service that a bankruptcy petition preparer can safely offer and complete on behalf of a pro se debtor ... is the 'transcription' of dictated or handwritten notes prepared by the debtor prior to the debtor having sought out the petition preparer's service[,]" *Guttierez,* 248 B.R. at 298; *see also In re Dunkle,* 272 B.R. 450, 455 (Bankr.W.D.Pa.2002) ("A petition preparer is only authorized to type information exactly as provided by potential debtors."); *Schneider,* 271 B.R. at 764–65 ("It is clear from § 110 that the BPP moves at his or her peril when performing any service beyond that of simply typing the information provided by a prospective debtor on approved bankruptcy forms."); *Bradshaw,* 233 B.R. at 326 ("Section 110 also makes clear that bankruptcy petition

---

26. Ms. Motley raised an argument in her Opposition, which was reiterated in her Post–Trial Brief, that because she faced the possibility of statutory fines, she is entitled to a jury trial, that the bankruptcy court is not authorized to conduct a jury trial, and that she does not consent to a jury trial before the bankruptcy court. Because the court has chosen not to impose fines, it will not address Ms. Motley's jury trial argument any further, other than pointing out that pursuant to 11 U.S.C.A. § 157(e) (West 1993 & Supp.2004), bankruptcy courts are authorized to hold jury trials, and that this court, in particular, is authorized to conduct jury trials pursuant to the Order entered on February 27, 1995, by the Judges of the United States District Court for the Eastern District of Tennessee.

preparers may only provide typing services to their customers and sets forth very specific requirements to be followed by petition preparers."); *In re Kaitangian*, 218 B.R. 102, 113 (Bankr.S.D.Cal.1998) ("[P]ortions of the House Report on the Bankruptcy Reform Act of 1994 regarding § 110 make it clear that the services of bankruptcy petition preparers are strictly limited to typing bankruptcy forms.").

Although the court believes that § 110 limits Ms. Motley to providing only typing services for potential debtors, she has admittedly engaged in other activities that appear to be outside the scope of § 110's limitations. Of particular concern to the court in these cases is the appearance that Ms. Motley is engaging in the unauthorized practice of law.

When engaging Ms. Motley and We the People of Knoxville, customers receive the Customer Packet consisting of six documents in a packet for their completion and review. *See* COLL. TRIAL EX. 1. The first document is the Bankruptcy Document Preparation Agreement (Preparation Agreement), setting forth the nature of the customer's business relationship with Ms. Motley and We the People of Knoxville and containing the following language:

> I hereby retain the services of We The People to type bankruptcy forms for me. I understand that all work to be performed by We The People under this contract will be done at my direction and using information supplied by me. I also understand that the owners and employees of We The People **are not attorneys and are prohibited from giving legal advice.** I further understand that should I have any legal questions about my bankruptcy, I can contact the WTP Supervising Attorney by telephone and he/she will provide general legal information to assist me in the handling of my legal matter on my

own. The Supervising Attorney is a resource for such information and will assist me in understanding the law of the state in the area of my matter. I understand the following:

> *The Supervising Attorney does not represent me and will not be appearing with me in court, communicating with any other person(s) on my behalf in my matter or drafting my documents. The Supervising Attorney can only answer general questions regarding the law and cannot give me specific legal advice on my matter. If I need specific legal advice on my matter, I understand that I can consult with an attorney of my choice.*

> I agree to be solely responsible for the accuracy of the information which I supply We The People, and that We The People has no obligation to independently verify the information. I also agree to hold harmless We The People and its agents from any and all liability which they may sustain from rendering services on my behalf. . . .

> I acknowledge that We The People has made no representation to me as to the ultimate Court approval of the documents submitted. I also acknowledge that the fee for typing the bankruptcy forms in the District I am filing in is $____; the Bankruptcy Court filing fee is $209.00, for a Chapter 7 Bankruptcy and $194.00 for a Chapter 13, payable to the U.S. Bankruptcy Court by U.S. Postal Money Order. Should I desire to have We The People make the required photocopies for me (if allowed by the U.S. Bankruptcy Trustee in the District of my filing), I will be charged a separate fee of $15.00.

> I certify that I have received a copy of this Agreement, and that I have read and understand it. I further acknowledge that I have received the Bankrupt-

cy Overview and that the Supervising Attorney does not represent me and no attorney-client relationship exists in my matter in regards to the Supervising Attorney.

COLL. TRIAL EX. 1. The Bankruptcy Document Preparation Agreement also has a signature line for the customer, a place for the customer's address and phone number, and a survey concerning where they heard about We the People of Knoxville.

The second document in the Customer Packet is a Customer Information Workbook (Workbook) that the customer is instructed to complete. COLL. TRIAL EX. 1. The customer actually fills out the information to be transcribed into his or her bankruptcy statements and schedules within the Workbook, and the questions therein conform, somewhat, to the Official Statement and Schedule forms that commence a debtor's bankruptcy case.

The third document is a Tennessee Step by Step Guide to the Bankruptcy Workbook (Guide), which gives detailed instructions for filling out the Workbook. COLL. TRIAL EX. 1. The Guide includes a bankruptcy glossary with definitions of various terms associated with bankruptcies. It also provides examples of completed workbook pages, instructing how to fill out the individual schedules and whether to fill out corresponding sections of other schedules. The Guide additionally provides a list of Tennessee's real and personal property exemptions, complete with the appropriate section of the Tennessee Code Annotated for each type of real and personal property that is subject to exemptions, as well as the full exemption amounts allowed.

The fourth document contained within the Customer Packet is entitled Bankruptcy Overview—Chapter 7 Tennessee (Over-

view). COLL. TRIAL EX. 1. The Overview was prepared by the General Counsel for We the People Forms and Service Centers USA, Inc. and approved by John David Moore, listed as supervising attorney in Tennessee, and is dated September 25, 2001.[27] The Overview consists of the following subsections: (1) What is Bankruptcy; (2) Chapter 7 Liquidation; (3) How Chapter 7 Works; (4) Discharge; (5) Property Taxes; (6) Other Taxes; (7) Child Support and Alimony; (8) Creditors' Meeting; (9) Rebuilding Your Credit; (10) Common Questions Asked at the Creditors' Meeting; (11) Filing Procedures; (12) Tennessee Exemptions; (13) Bankruptcy Questions. Throughout this Overview, customers are provided with the answers to "generic" legal questions, ranging from insolvency to the automatic stay. Additionally, the Overview again provides customers with a list of Tennessee's real and personal property exemptions that sets forth the maximum amount of exemptions allowed and the specific Tennessee Code Annotated section codifying the exemption.

The fifth document is another copy of the Tennessee Bankruptcy Exemptions table (Exemption Table), complete with the Tennessee Code Annotated section and maximum exemption amounts for each. The Exemption Table also states:

*How to use this table of exemptions*

The following is a list of the Tennessee exemptions that can be claimed to exempt both real and personal property in your bankruptcy petition. Everything that is exempted is property that you will keep and will not be sold to pay the creditors' claims. The exemptions are numbered 1 to 32 for your convenience. Please place the number of the exemption that matches the property: 1) in the Schedule where you have listed

---

**27.** At trial, Ms. Motley testified that Jeffrey Kohl, an attorney practicing in Nashville, is the current supervising attorney for We the People of Knoxville.

property (Schedule A (Real Property) and/or B (Personal Property)), and 2) also place that exemption number in Schedule C. Please note that not all of your property may have a matching exemption. If you have questions about the exemptions, please refer to your Bankruptcy Overview.

COLL. TRIAL Ex. 1.

The sixth and final document contained in the Customer Packet is entitled "Federal Bankruptcy Courts–Where to File Your Petition." COLL. TRIAL Ex. 1. It lists the counties of Tennessee in alphabetical order and details which district and division services which county. It also advises that customers "must file in the court assigned to the county where [they] have resided in for at least the last 180 days." COLL. TRIAL Ex. 1.

With respect to her own actions, and as directed by the court, Ms. Motley outlines the basic schedule of events detailing what happens when a customer utilizes the services of We the People of Knoxville in her May 6, 2004 Affidavit.[28] Ms. Motley states that "[w]hen a customer comes into my store, he/she has decided to commence a bankruptcy case under chapter 7 and asks for the materials to do that." AFF. K. MOTLEY, at ¶ 6. At the initial meeting, and prior to engagement, Ms. Motley meets with each individual customer who executes the Bankruptcy Document Preparation Agreement and pays the fee for the document preparation services. AFF. K. MOTLEY, at ¶ 8.

Ms. Motley "hand[s] them six documents [the Customer Packet] and identify them to the customer.... These documents have been prepared or reviewed by a lawyer licensed to practice law in the State of Tennessee." AFF. K. MOTLEY, at ¶ 6. She then "describe[s] the [Customer Packet] documents in detail and briefly go[es] through the workbook showing the customer items to be filled out[, and] recommend[s] the step-by-step guide be used to assist in the filling-out of the workbook." AFF. K. MOTLEY, at ¶ 9. Ms. Motley also tells her customers

> to fill-out the workbook at home and if a question arises to call me and I would try to be helpful but I specifically tell the customer I would not say what to put in the workbook or how to fill it out. I also tell the customer that if he/she has a legal question, he/she is free to call our supervising attorney but the supervising attorney would not give them advice specific to his/her situation, only general legal information which, hopefully, would enable the customer to fill out the workbook.

AFF. K. MOTLEY, at ¶ 10. Ms. Motley testified that some customers complete their Customer Packets at home, while others remain at We the People. In her Supplemental Affidavit, Ms. Motley states that "[i]n cases where the debtor fills out the workbook in my store, I have spent up to three hours 'holding the debtor's hand.' " SUPP. AFF. K. MOTLEY, at ¶ 5.

Customers are advised to return the prepared workbook to Ms. Motley, who advises the customer that it takes between seven and ten business days "to have the information from the workbook transferred onto the official forms for signature." AFF. K. MOTLEY, at ¶ 11. At trial, Ms. Motley testified that this delay in completing the customer's statements and schedules occurs because she is required by We the People USA to send all completed workbooks to Ms. Silas for process-

---

**28.** She expressly sets forth variations for any of the Debtors' individual cases. *See* AFF. K. MOTLEY, at ¶ 18 through ¶ 22.

ing. Ms. Silas, who resides in Soldotna, Alaska, is an employee of We the People USA and is the person who actually transcribes the information contained in the Workbook onto the computer-generated bankruptcy forms. *See also* AFF. K. MOTLEY, at ¶ 12. Before she sends the customers' Workbooks to Ms. Silas, Ms. Motley states that "I review the workbook with the customer to assure legibility and completeness. Those are the only two characteristics of the workbook with which I am concerned; I never discuss or deal in any way with the substance of the information requested in the workbook or which the customer provides." AFF. K. MOTLEY, at ¶ 11.

Ms. Silas then returns the completed forms to Ms. Motley, who notifies the customer that the documents are ready for execution. AFF. K. MOTLEY, at ¶ 13. Prior to the customer's return, Ms. Motley states that "I review [the documents] to make certain all the information the customer provided in the workbook was transferred accurately to the documents and I tab all pages where the customer must affix a signature." AFF. K. MOTLEY, at ¶ 14. When the customer returns to We the People of Knoxville's office in order to sign the completed statements and schedules, Ms. Motley "review[s] them with the customer to see whether there are any changes the customer wishes to make." AFF. K. MOTLEY, at ¶ 15.

Ms. Motley then states that "[u]pon conclusion of that review, the customer signs a receipt acknowledging receipt of a copy of the documents and that they have paid [We the People of Knoxville]'s fee. (The receipt also states that the customer acknowledges [We the People of Knoxville] did not act in any way to influence what information was placed in the docu-

ments.)[.]" AFF. K. MOTLEY, at ¶ 15.[29] Then, "[i]f the customer wishes, [Ms. Motley] post[s] the documents to the Bankruptcy Court and send[s] the customer the filing information [they] receive back from the Court." AFF. K. MOTLEY, at ¶ 16. Additionally, at trial, Ms. Motley testified that she provides customers with the Customer Packet, types documents for filing, answers generic questions like where to sign, refers specific or legal questions to a supervising attorney, has completed forms when asked to by customers, and has filed documents with the court.

Clearly, the evidence before the court establishes that Ms. Motley has engaged in activities that far exceed those offered by a mere typist, leading the court to its concerns regarding the unauthorized practice of law. Moreover, while the entire Customer Packet presents problems, the court is most concerned with the Guide and Overview given to customers by Ms. Motley. The information contained in these documents actually informs potential debtors what to include within their bankruptcy schedules, along with providing answers to what Ms. Motley believes are "generic" bankruptcy questions. The court disagrees with her assessment that these are "generic" legal questions, finding instead that these documents disseminate legal advice, some of which is misleading and contradictory.

For example, the Guide provides instructions for filling out Schedule B, taking each form line-by-line, and giving specific examples of what information needs to be completed for each, such as the following:

4. *Household goods*—List items of value. For example, 3 rooms of furnishings, including T.V., radio, VCR, and Washer. List also the "Quick sale val-

---

**29.** As discussed, this is contrary to Ms. Motley's Disclosure of Compensation and the Offi-

cial Form 19 Certification, wherein she certified to the court that she received the fees.

ue". Think of the "quick sale value" as being pawnshop value or yard sale value. List one total for everything under Column V (for example, $800).

4a. *Household goods "secured"*—If you have a loan on a specific household item or if someone has legal right to take an item back, then it is probably secured. List the name and address of the creditor, account # and the amount owed. If you list a creditor for this item, **then you must complete Schedule D.**

COLL. TRIAL EX. 1. At the top of this document, potential debtors are also advised "Important, if you complete Schedule B, you must also complete Schedule C." COLL. TRIAL EX. 1. Samples of filled-out Worksheet pages for the various statements and schedules are also included within the Guide.

The Overview presents similar problems. For example, the Discharge section states, in part:

Approximately 3–6 weeks after the meeting of the creditors, the debtor will receive a "discharge" which extinguishes the debtor's obligations to pay many debts. Unsecured debts may generally be defined as obligations based purely on future ability to pay as opposed to secured debts which are based on the creditor's right to seize pledged property upon default. Creditors whose unsecured debts are discharged may no longer initiate or continue any legal or other action against the debtor to collect the obligations.

Because secured creditors retain some rights that may permit them to seize pledged property, even after a discharge is granted, it is often advantageous for the debtor to "reaffirm" a debt when property, such as a car, has been pledged to the creditor. A "reaffirmation" is an agreement between the debtor and the creditor whereby the debtor will pay the money owed even though the debtor filed for bankruptcy. In return, the creditor promises that as long as payments are made, the creditor will not repossess, or take back, the car or other property. In some situations, it may not be necessary to reaffirm your debt if you remain current on your monthly payments.

The written agreement to reaffirm a debt must be filed with the court and, if the debtor is not represented by an attorney, must generally be approved by the Judge before the debtor is discharged.

The bankruptcy law regarding the scope of a Chapter 7 discharge is complex. Know your rights. **Should you have any doubts about the appropriateness of bankruptcy in your particular case, you should seek the advice of an attorney.**

In addition, don't forget that you enjoy the right, as a WE THE PEOPLE customer, to chat with our Supervising Attorney, at no additional cost to you.

As a general rule, however, all debts in a Chapter 7 Bankruptcy are discharged. Those exceptions include alimony and support obligations, certain taxes, debts incurred by fraud, embezzlement, larceny, willful malicious injury, debts arising from driving while intoxicated, and certain educational loans.

In the event of fraud during bankruptcy proceedings, such as the hiding of assets or the failure of the debtor to obey a lawful order of the court, the discharge can be denied or revoked. Bankruptcy fraud is a felony under Federal criminal law and may result in arrest, fine or imprisonment.

COLL. TRIAL EX. 1. Quite clearly, this section provides potential debtors with more than simply "generic" legal answers. For instance, it makes statements regarding the reaffirmation of debts, and dangerously advises that sometimes reaffirmation is

not necessary if payments remain current.[30]

The court has determined that the documents contained in the Customer Packet disseminate legal advice and are misleading. Some of the documents expressly give legal advice, while others simply reference that a supervising attorney is available for consultation at no additional charge. Even though this attorney is not supposed to offer legal advice, his mere availability misleads customers into thinking that they are being given all of the information they require and that all of the information they are given is correct. The court recognizes that the documents in the Customer Packet are forms provided to franchisees by We the People USA. However, although Ms. Motley did not actually prepare these documents herself, she presents and publishes them to customers, thus endorsing the statements contained therein. The court believes that the documents in the Customer Packet do provide legal advice, again giving rise to the court's concerns regarding the unauthorized practice of law.

## VI

### Violation of § 110(k)—Unauthorized Practice of Law

The question of what constitutes the practice of law in a specific state is a matter of state law. *Moffett*, 263 B.R. at 813; *Guttierez*, 248 B.R. at 294; *Kaitangian*, 218 B.R. at 108 ("Section 110(k) provides that the ability of nonlawyers to practice before bankruptcy courts in a given jurisdiction will be governed by '[relevant state] law, including rules and laws that prohibit the unauthorized practice of law' as well as by § 110 itself.") (quoting 2 COLLIER ON BANKRUPTCY ¶ 110.12 (15th ed.1997)). In Tennessee, the unauthorized practice of law is expressly prohibited by statute, which states that "[n]o person shall engage in the 'practice of law' or do 'law business' or both as defined in § 23–3–101, unless such person has been duly licensed therefor[.]" TENN. CODE ANN. § 23–3–103 (Supp.2003).

As used in this chapter, unless the context otherwise requires:

(1) "Law business" means the advising or counseling for a valuable consideration of any person ..., as to any secular law, or the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights ...; and

(2) "Practice of law" means the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents ... in connection with proceedings pending or prospective before any court ....

TENN. CODE ANN. § 23–3–101 (Supp.2003).

### A

### Motion for Certification to the Tennessee Supreme Court

On July 7, 2004, Ms. Motley filed her Motion for Certification, asking the court

---

**30.** In fact, these representations are contradictory to Sixth Circuit authority. *See Gen. Motors Acceptance Corp. v. Bell (In re Bell)*, 700 F.2d 1053, 1057–58 (6th Cir.1983) (recognizing that only through redemption or reaffirmation can Chapter 7 debtors retain secured property following discharge); *In re Lawson*, No. 04–20441, 2004 Bankr.LEXIS 740, at *5 (Bankr.E.D.Ky. May 28, 2004) ("A debtor who is unable to exercise his or her right of redemption ... or to negotiate a reaffirmation agreement ... simply has no choice but to surrender the collateral."); *In re Pendlebury*, 94 B.R. 120, 121 n. 2 (Bankr. E.D.Tenn.1988) ("[A] debtor may voluntarily repay debts ... even if a reaffirmation is not obtained. However, ... a secured creditor, by accepting voluntary payments, [is not] deprived of its right to repossess the secured collateral upon termination of the automatic stay." (citation omitted)).

to certify the following question to the Tennessee Supreme Court:

> Whether Ms. Motley's sale of generic legal documents and preparation services for such documents and the provision of general, non-individualized legal information in connection with such documents constitutes the unauthorized practice of law under Tennessee State law?

Mot. for Certification. In support of her request, Ms. Motley argues that because the Tennessee Supreme Court has not expressly answered this question, she and We the People are in danger of being subjected to differing and/or inconsistent outcomes in the proceedings pending against them in other tribunals in the State of Tennessee [31] if the question is not certified. Ms. Motley does not appear to question the court's authority to apply state law; rather, she argues that the law regarding the unauthorized practice of law, as it relates to her and other bankruptcy petition preparers, is unsettled, and therefore, only the Tennessee Supreme Court may definitively answer the question.

Submission of a certified question to the Tennessee Supreme Court is governed by Tennessee Supreme Court Rule 23, which provides, in material part:

> The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States

Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee.

Tenn. Sup. Ct. R. 23, § 1; see also Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 679 n. 1 (Tenn.2002); Swafford v. Harris, 967 S.W.2d 319, 320 n. 1 (Tenn.1998).

■ Basically, if the court finds unanswered questions of law concerning the Tennessee Supreme Court's definition as to what constitutes the unauthorized practice of law, the court may certify the question to the Tennessee Supreme Court. The Tennessee Supreme Court, in its discretion, may then answer the question, or it may choose not to. The issue, however, is moot, because the court has found ample case law defining the unauthorized practice of law in the State of Tennessee. Thus, it is not necessary to certify Ms. Motley's question to the Tennessee Supreme Court, and the Motion for Certification will be denied.

### B

### Tennessee's Stance on Unauthorized Practice of Law

■ The Tennessee Supreme Court has held that "[t]he purpose of our statutes

---

**31.** Ms. Motley's statements apply not only to We the People of Knoxville, but also to We the People USA and other franchises thereof. In her Motion for Certification, Ms. Motley states that the question "is at the heart of matters pending before several inferior Tennessee State courts, in which matters [We the People] is a defendant and with respect to which matters the Supreme Court of Tennessee is being requested to consider the same question

on an expedited case." Mot. for Certification ¶ 2. At trial, Ms. Motley testified that she and We the People of Knoxville have an action pending against them in Blount County, Tennessee. Her counsel advised the court that an action was pending against another We the People franchiser in the United States Bankruptcy Court for the Middle District of Tennessee, in which a similar request for certification was denied.

regulating the practice of law is to prevent the public's being preyed upon by those who, for valuable consideration, seek to perform services which require skill, training and character, without adequate qualifications." *Old Hickory Eng'g & Mach. Co., Inc. v. Henry,* 937 S.W.2d 782, 786 (Tenn.1996) (quoting *Third Nat'l Bank v. Celebrate Yourself Prod., Inc.,* 807 S.W.2d 704, 706 (Tenn.Ct.App.1990)). It has additionally adopted the following ethical consideration concerning the practice of law:

> It is neither necessary nor desirable to attempt the formulation of a single specific definition of what constitutes the practice of law. Functionally the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client; and thus, the public interest will be better served if only lawyers are permitted to act in matters involving professional judgment. Where this professional judgment is not involved, non-lawyers, such as court clerks, police officers, abstracters, and many governmental employees, may engage in occupations that require a special knowledge of law in certain areas. But the services of a lawyer are essential in the public interest whenever the exercise of professional legal judgment is required.

*In re Pet. of Burson,* 909 S.W.2d 768, 775 (Tenn.1995) (quoting TENN. SUP. CT. R. 8, EC 3–5).

 "[R]egulations proscribing the unauthorized practice of law are designed to protect 'the public from being advised and represented in legal matters by incompetent and unreliable persons over whom the judicial department could exercise little control.'" *Crews v. Buckman Labs.*

*Int'l, Inc.,* 78 S.W.3d 852, 865 (Tenn.2002) (quoting *Bar Ass'n of Tenn., Inc. v. Union Planters Title Guar. Co.,* 46 Tenn.App. 100, 326 S.W.2d 767, 779 (1959)); *see also Burson,* 909 S.W.2d at 776–77 ("[T]he purpose of regulation governing the unauthorized practice of law ... is to 'serve the public right to protection against unlearned and unskilled advice in matters relating to the science of the law.'") (quoting *Application of N.J. Soc'y of Certified Pub. Accountants,* 102 N.J. 231, 507 A.2d 711, 714 (1986)). It is the court's responsibility to "'regulate the practice of law and to restrain such practice by laymen in a common-sense way in order to protect primarily the interest of the public[.]'" *Burson,* 909 S.W.2d at 777 (quoting *Cowern v. Nelson,* 207 Minn. 642, 290 N.W. 795, 797 (1940)).

 Under those guidelines, the Tennessee Supreme Court has recently held that "[t]he preparation and filing of a complaint requires 'the professional judgment of a lawyer,' and is, therefore, the practice of law." *Old Hickory Eng'g & Mach. Co.,* 937 S.W.2d at 786. Following that lead, the Tennessee Court of Appeals subsequently determined that "the drafting of pleadings and legal documents or the selection and completion of form documents constitutes the practice of law." *Fifteenth Judicial Dist. Unified Bar Ass'n v. Glasgow,* No. M1996–00020–COA–R3–CV, 1999 Tenn.App. LEXIS 815, at *12–*13, 1999 WL 1128847, at *4 (Tenn.Ct.App. Dec.10, 1999) (holding that "more than mere clerical work ... [and] not simply reducing [the] clients' words to writing or filling in blanks on preprinted forms at the specific direction of [the] clients" constitutes the unauthorized practice of law). In making its determination, the court of appeals acknowledged the following:

> As a general matter, other courts have held that the sale of self-help kits or

printed legal forms does not constitute the unauthorized practice of law as long as the seller provides the buyer no advice regarding which forms to use or how the forms should be filled out. Conversely, sellers who do advise customers on which forms to use and how to fill them out have been found to be engaging in the practice of law.

*Glasgow*, 1999 Tenn.App. LEXIS 815, at *9 n. 4, 1999 WL 1128847, at *3 n. 4 (internal citations omitted).[32]

The *Glasgow* court further noted that "with its decision in *Old Hickory Eng'g & Mach. Co. v. Henry*, the [Tennessee Supreme] Court has aligned Tennessee with the majority of jurisdictions holding that the drafting of pleadings and legal documents or the selection and completion of form documents constitutes the practice of law." *Glasgow*, 1999 Tenn.App. LEXIS 815, at *12, 1999 WL 1128847, at *4; *accord Ostrovsky v. Monroe (In re Ellingson)*, 230 B.R. 426, 433 (Bankr.D.Mont. 1999) (holding that it is the majority view that the preparation of legal documents, even with pre-printed forms, generally involves more than "mere scrivener's duties" and thus, is construed as the practice of law.).

Ms. Motley's actions and activities in dealing with customers of We the People of Knoxville have previously been outlined in detail. She described both at trial and in her May 6, 2004 Affidavit the process by which customers become debtors, and in her Supplemental Affidavit, Ms. Motley states that she has spent hours "holding debtors' hands."[33] Ms. Motley testified that she will answer generic questions "to an extent" and will refer "legal" questions to Mr. Kohl, the supervising attorney. She acknowledged filling in forms for clients after they have asked her to, and at trial, she identified her handwriting on numerous pages for several of the Debtors.

Ms. Motley testified that once she receives a completed Workbook from a customer, she reviews it to make sure it is legible and complete before faxing the document to Ms. Silas. Although she testified that she has not filled out blanks on any Debtors' Workbook without first being asked, Ms. Motley did testify that she has pointed out blanks and asked customers if they intended to leave those sections blank. Ms. Motley also testified that she has referred clients to the Tennessee Exemption List when they have neglected to

---

**32.** The language chosen by the *Glasgow* court comports with the following:

> The majority of courts of other jurisdictions have held that the mere sale of forms with instructions does not constitute the unauthorized practice of law. However, these decisions have also consistently opined that, when the non-attorney also gives consultation and/or advice to the client regarding the legal process, where to file forms, or how to fill out the forms, this does constitute the unauthorized practice of law.

*In re Campanella*, 207 B.R. 435, 448 (Bankr. E.D.Pa.1997) (citations omitted).

**33.** More specifically, in the May 6, 2004 Affidavit, Ms. Motley states that in Ms. Buckner's case, Ms. Buckner was at We the People for more than three hours filling out the Workbook. Aff. K. Motley, at ¶ 19. Ms. Buckner had trouble reading some of the Workbook and the Guide, so Ms. Motley read portions to her after being asked. Aff. K. Motley, at ¶ 19. Also, Ms. Buckner did not have all of the financial information she needed so she called Ms. Motley at a later time and asked her to write that information in her Workbook. Aff. K. Motley, at ¶ 19.

Ms. Motley also states that Mr. Smith remained in the store for more than three hours filling out his Workbook. Aff. K. Motley, at ¶ 21. Mr. Smith also left a number of items blank, and after Ms. Motley was alerted by Ms. Silas of the omissions, she contacted Mr. Smith to obtain the missing information. Aff. K. Motley, at ¶ 21.

fill in Schedule C items, but that she does not herself match up the schedules for her customers. Additionally, Ms. Motley testified that she has told customers that once they have filed their bankruptcy petition, they can give their case number to collectors who will have to stop calling.

Ms. Wiley's testimony confirmed many of the activities conducted by Ms. Motley, as she described the details of her experience as a customer of We the People of Knoxville and her dealings with Ms. Motley. Ms. Wiley testified that Ms. Motley went over the completed Workbook with Ms. Wiley and her husband, mentioning blanks in some areas and asking if she wanted to leave them blank. Ms. Wiley stated that had Ms. Motley not specifically called the blank items to her attention, they would have remained blank. In addition, Ms. Wiley recalled Ms. Motley telling her to avoid bill collectors until she received her case number.

The court believes that these services are not only outside the scope of typing services allowable under § 110, but this type of "hand-holding," pointing out blank items, and providing even "generic" explanations constitute the unauthorized practice of law as defined under Tennessee law. In addition, other aspects of Ms. Motley's bankruptcy petition preparation business, such as the dissemination of the Customer Packet, advising customers about exemptions, and the availability of a supervising attorney, give rise to legal conclusions, legal decisions, and legal advice which also constitute the unauthorized practice of law.

It has been held by other courts that advising debtors about exemptions constitutes the practice of law. *See, e.g., Gabrielson*, 217 B.R. at 826; *Kaitangian*, 218 B.R. at 110. In fact, noting that "[n]umerous Courts, including this one, have found that advising clients about exemp-

tions, or determining which exemptions apply to a client's property, is the unauthorized practice of law," the *Moffett* court held that it was "inappropriate for [a bankruptcy petition preparer] to even provide a list of exemption statutes to clients." *Moffett*, 263 B.R. at 814. Similarly, "providing clients with explanations or definitions of such legal terms of art such as 'reaffirmation' is, by itself, giving legal advice." *Kaitangian*, 218 B.R. at 111; *see also In re Herren*, 138 B.R. 989, 994–95 (Bankr. D.Wyo.1992).

> Preparation of legal documents is "commonly understood to be the practice of law." What constitutes "preparation of legal documents" is construed broadly. "Preparation of instruments, even with preprinted forms, involves more than a mere scrivener's duties" and, therefore, constitutes the practice of law. Legal documents purport to allocate legal obligation.
>
> . . . .
>
> The record is clear that Monroe advised [the debtors] of available exemptions, provided them with a comprehensive list of available exemptions, determined where property and debts were to be scheduled, summarized and reformulated information solicited from clients, and generated the completed bankruptcy forms for [them] on her computer. These tasks require the exercise of legal judgment beyond the capacity and knowledge of lay persons such as Monroe.

*In re Ellingson*, 230 B.R. 426, 433–34 (Bankr.D.Mont.1999) (quoting *Monroe v. Horwitch*, 820 F.Supp. 682, 687 (D.Conn. 1993)) (internal citations omitted).

> When a person holds himself out to the public as competent to exercise legal judgment, he implicitly represents that he has the technical competence to analyze legal problems and the requisite

character qualifications to act in a representative capacity. When such representations are made by persons not adequately trained or regulated, the dangers to the public are manifest.

*Ellingson,* 230 B.R. at 434 (quoting *Wash. v. Hunt,* 75 Wash.App. 795, 880 P.2d 96, 100 (1994)).

 The court agrees with the majority of courts and adopts the following reasoning and findings by the *Guttierez* court concerning the limitations of § 110:

> So what *does* § 110 tacitly permit? The answer is a nutshell is "not much." Section 110 itself proscribes virtually all conduct falling into the category of guidance or advice, effectively restricting "petition preparers" to rendering only "scrivening/typing" services. Anything else—be it suggesting bankruptcy as an available remedy for a debtor's financial problems, merely explaining how to fill out the schedules, or answering questions about exemptions or whether a claim is or is not secured will invariably contravene either state laws proscribing the unauthorized practice of law or other more specific provisions of § 110. The only service that a bankruptcy petition preparer can safely offer and complete on behalf of a *pro se* debtor after the enactment of § 110 is the "transcription" of dictated or handwritten notes prepared by the debtor prior to the debtor having sought out the petition preparer's service. Any other service provided on behalf of the debtor by a non-attorney (even telling the debtor where the information goes on the form) is not permitted under state unauthorized practice of law statutes, and so is also not authorized by § 110.

*Guttierez,* 248 B.R. at 297–98 (footnotes omitted).

 The court additionally agrees that "[p]lugging in solicited information from questionnaires and personal interviews to a pre-packaged bankruptcy software program constitutes the unauthorized practice of law." *Kaitangian,* 218 B.R. at 110; *accord Moffett,* 263 B.R. at 815; *Ellingson,* 230 B.R. at 433. "[Ms. Motley] is only permitted to type information exactly as debtors provide it to her, in written form on official bankruptcy forms[, and] without any assistance from her regarding exemptions." *Moffett,* 263 B.R. at 814–15. As discussed by the *Moffett* court,

> Some Courts have held that the use of any questionnaire to solicit information from the client which is then used to complete the official forms through use of a computer program is the unauthorized practice of law. In fact, some Courts have held that the use of a computer program by a petition preparer amounts to the unauthorized practice of law, because this involves more than the simple typing or copying of information provided by the client onto official bankruptcy forms. Even explaining to a client how to fill out schedules or a questionnaire, as Ms. Yarrington stated that she does, is considered to be beyond the scope of what a bankruptcy petition preparer may do without violating the unauthorized practice of law rules.

> This Court agrees that the use of a bankruptcy questionnaire to prepare a petition is the unauthorized practice of law, as transferring information from the questionnaire to the official bankruptcy forms invariably will require some legal judgment. This Court has no problem with Ms. Yarrington using a computer program, but she is only permitted to receive information from potential debtors on official bankruptcy forms. She may provide copies of these forms if necessary, since they are public documents, but may not provide any

guidance as to how to fill out the schedules. In other words, the client should have already handwritten the entire petition, including all schedules, so that Ms. Yarrington only need type it.

*Moffett*, 263 B.R. at 815 (internal citations omitted). Additionally, "[t]he bankruptcy petition preparer cannot improve upon the prospective debtor's answers, cannot counsel the client on options, and cannot otherwise provide legal assistance to the prospective debtor, directly or indirectly." *Meininger v. Burnworth (In re Landry)*, 268 B.R. 301, 305 (Bankr.M.D.Fla.2001).

█ In her defense, Ms. Motley argues that without her services, "many individuals otherwise would be unable to avail themselves of the relief provided by the Bankruptcy Code." POST-TRIAL BRIEF, at p. 28 n. 62. This statement, however, ignores the simple fact that prospective debtors may obtain copies of the necessary statements and schedules from many sources, and there is nothing in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Local Rules of the United States Bankruptcy Court for the Eastern District of Tennessee requiring bankruptcy documents be typed. *See also In re Wagner*, 241 B.R. 112, 122 (Bankr. E.D.Pa.1999).

█ Additionally, Ms. Motley testified that not only does she tell her customers that she is not an attorney, that she is not allowed to answer legal questions, and that she is not giving legal advice, but this information is found, in writing, on various documents contained in the Customer Packet. Ms. Motley also states in her May 6, 2004 Affidavit that each customer "is told, several times, [We the People of Knoxville] is not a lawyer, I am not a lawyer and that I cannot and will not give legal advice." AFF. K. MOTLEY, at ¶ 7. While this may be true, simply disavowing that she is giving legal advice does not negate the activities that Ms. Motley does admit to performing. *See, e.g., Moore v. Jencks (In re Moore)*, 232 B.R. 1, 6 (Bankr.D.Me.1999) (comparing the preparer's stressing that he is not an attorney but giving legal advice to that of a non-licensed individual practicing medicine while maintaining that he is not a doctor).

Moreover, the fact that Ms. Motley does not orally give what she believes to be "legal" advice to We the People of Knoxville's customers is irrelevant. *See, e.g., Landry*, 268 B.R. at 304 ("Legal advice is legal advice, whether it comes directly from the petition preparer or indirectly via, for example, a bankruptcy treatise being recited by that preparer."). Even if the information coming directly out of her mouth is not legal advice "per se," the documents that Ms. Motley provides in the Customer Packet give legal information, legal conclusions, and legal advice in that they provide explicit instructions as to what the terms mean, how to fill the schedules out, and to remember cross-references between schedules. And, most glaringly, they provide customers statutory information regarding Tennessee's real and personal property exemptions, not once, but three separate times. Ms. Motley's dissemination of the information contained in the Customer Packet to these Debtors constituted the unauthorized practice of law, especially in connection with her own actions of "hand-holding," prompting the Debtors to fill in omitted information, and advising them about their "rights" concerning collectors once the bankruptcy petition had been filed.

## C

### Unfair and Deceptive Acts

The finding that Ms. Motley has engaged in the unauthorized practice of law also leads the court to question whether

the activities conducted by Ms. Motley are unfair and deceptive acts. "Courts have found that the unauthorized practice of law by a bankruptcy petition preparer may constitute a fraudulent, unfair or deceptive act within the context of 11 U.S.C. § 110(i)(1)." *Moffett*, 263 B.R. at 813; *see also Doser*, 292 B.R. at 659 ("The unauthorized practice of law constitutes a fraudulent, unfair or deceptive act within the context of 11 U.S.C. § 110(i)(1)."); *Dunkle*, 272 B.R. at 456 (same).

■ Based upon the evidence presented, the court believes that some of Ms. Motley's representations and activities do constitute unfair and deceptive acts within the context of both § 110(i) and (j). First, the court is concerned about several representations made during Ms. Motley's dealings with Ms. Wiley. The Wileys called Ms. Motley and We the People of Knoxville after seeing its television advertisement and were given general information regarding the prices and services offered. They then visited We the People of Knoxville, obtained the Customer Packet, paid their $214.00 fee, and signed the Bankruptcy Document Preparation Agreement, which Ms. Motley also advised was the Wileys' receipt. The Wileys informed Ms. Motley that they were concerned about a potential garnishment and that they were separated. They were also concerned about any possibility of losing their house, and Ms. Wiley testified that they "chickened out" about filing at that initial time.

Ms. Motley then advised Ms. Wiley that she could call Mr. Kohl, We the People of Knoxville's supervising attorney, and he could answer any of her non-specific legal questions concerning the house. Ms. Motley's husband was assisting her in the store that day, and Ms. Wiley testified that he told her that if debtors did not have much equity in a house, they generally got to keep it. Ms. Wiley further testified that Ms. Motley's husband actually looked at her mortgage statement to see if he could ascertain how much equity was in the Wileys' home.

Following Ms. Motley's advice, Ms. Wiley called Mr. Kohl, who agreed with the general statements regarding equity that Mr. Motley's husband had represented. Ms. Wiley testified that she told Mr. Kohl about her concerns, relayed the information from her mortgage statement, and generally informed him about the Wileys' circumstances. Mr. Kohl then told Ms. Wiley that based upon the circumstances of their particular case, the Wileys would probably be fine.

Subsequent to Ms. Wiley's conversation with Mr. Kohl, the Wileys returned to We the People of Knoxville and completed their Workbook in the office. It was at this time that Ms. Motley prompted them about missing information. When the Wileys returned to We the People of Knoxville to sign their prepared documents, Ms. Wiley noticed a mistake, which was corrected. At that time, Ms. Wiley recalls asking Ms. Motley whether she knew if any bankruptcies had been turned down for any of We the People of Knoxville's customers, to which Ms. Motley replied that We the People had handled more than 10,000 cases and, in her experience, she did not know of any bankruptcies that had been denied. The Wileys gave Ms. Motley their filing fee, and Ms. Motley filed their joint bankruptcy case on April 28, 2004. Ms. Motley testified that the fact that the Wileys were separated made no difference as to the filing of their bankruptcy case.[34]

---

**34.** This statement further supports the court's determination that Ms. Motley has engaged in the unauthorized practice of law. The determination as to the effect, or lack thereof, that a debtor's marital relationship has in the context of a bankruptcy filing calls for a legal

After the Wileys filed their case, problems arose, and Ms. Wiley contacted Ms. Motley about the possibility of re-filing if her case was dismissed.[35] At that time, Ms. Motley told Ms. Wiley that if the case did not go well, and Ms. Wiley needed to re-file individually, We the People of Knoxville would prepare her new bankruptcy documents for free. To date, however, the Wileys' case has not been dismissed, and it appears to be on track towards discharge.

Nevertheless, the testimony given by Ms. Wiley confirms that something is amiss with Ms. Motley's practices. Initially, the fact that Ms. Motley's husband is present at We the People of Knoxville, giving off-hand, semi-legal, and incorrect information to customers constitutes an unfair, deceptive, and fraudulent act, in and of itself. Even if Ms. Motley's husband is not an actual employee of We the People of Knoxville, pursuant to her testimony, he is a part-owner of Motley 4, LLC, which does business as We the People of Knoxville. His presence at We the People of Knoxville gives a false impression to customers that he is an employee and representative of We the People of Knoxville. Furthermore, his choice to interact with customers and interject statements like those offered to the Wileys completely misleads customers into believing first that he is knowledgeable in the area of bankruptcies, and second, that the information they are given was correct. In the Wileys' case, obviously neither presumption was correct.

Additionally, Ms. Motley and We the People of Knoxville offer and recommend to customers the services of Mr. Kohl, a supervising attorney, who, according to Ms. Motley, is allowed to answer any non-specific or general legal questions that customers might have. The court questions the ability of any lawyer to give non-specific or general, yet effective, legal advice. Although the court recognizes that some Chapter 7 bankruptcy cases are "routine" in that they are not complex and therefore require minimal administration, it cannot be presumed that all cases will be "routine." Furthermore, to the individual debtor who is facing bankruptcy for the first time, his or her case is certainly not "routine." When questions arise, it is difficult to ascertain a debtor's legal rights without the benefit of specific information regarding that debtor and his or her circumstances. As clearly evidenced in the Wileys' case, even with "general" information concerning a mortgage, for example, the supervising attorney cannot provide completely accurate advice. Additionally, the availability of a supervising attorney is unfair and deceptive, because it gives debtors a false security that their personal

conclusion. The fact that Ms. Motley made such a determination in the Wileys' case evidences that she has, in fact, made her own legal conclusions concerning her customers' bankruptcy cases.

**35.** The U.S. Trustee filed a Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) (West 1993 & Supp.2004) for substantial abuse on May 19, 2004, and the Wileys were noticed for a 2004 examination. On June 1, 2004, their mortgage company filed a Motion for Relief from the Automatic Stay, in order to exercise its rights regarding the Wileys' home, which was granted on June 23, 2004. The Wileys attended their initial Meeting of Creditors on June 2, 2004, which was continued to and completed on June 22, 2004. They retained counsel on June 17, 2004, who filed their Amended Schedules I (income) and J (expenses) and Amended Statement of Intent on June 22, 2004. Additionally, on June 23, 2004, the Wileys filed an Amended Schedule B (personal property). Subsequently, the U.S. Trustee withdrew the Substantial Abuse Motion on June 25, 2004, following the Wileys' 2004 examination.

In addition to the Wileys' case, problems also arose in the Rose, Buckner, Steele, Smith, and Jackson cases.

legal questions are being answered correctly in relation to their own personal bankruptcy case. This is not the case, however, and it unfairly prejudices debtors.

The court is also concerned about the false sense of security that Ms. Motley relays when offering customers statistical information concerning her experience as a bankruptcy petition preparer. Ms. Motley testified that she has told customers that We the People has done more than 10,000 bankruptcies nationwide because the statistics are good for business. Ms. Wiley did not confirm that Ms. Motley clarified her statement with the "nationwide" reference, but even so, making blanket statements to customers that "we" have prepared more than 10,000 bankruptcies is misleading and deceptive. Ms. Motley's own testimony evidenced her intent to use We the People USA's statistics to buttress her business at We the People of Knoxville due to its lack of actual filings in the bankruptcy courts and Ms. Motley's own lack of personal experience concerning bankruptcy itself.

In addition, the information dispensed by Ms. Motley and We the People of Knoxville is erroneous in some instances, and in other instances, at a minimum, inconsistent. For example, although the Bankruptcy Document Preparation Agreement states that the filing fee payable to the U.S. Bankruptcy Court must be by U.S. Postal Order, Ms. Motley tells customers that they must pay by check or money order. In contradiction, the Overview actually contains the correct information regarding the types of payment that the clerk's office will accept; i.e., any type of money order, cashier's check, or the exact amount owed in cash. The Overview, however, incorrectly states that the filing fee is $200.00 instead of the correct $209.00, which amount is actually reflected on the

Bankruptcy Document Preparation Agreement.

Along those lines, information filed with the court as part of the Debtors' bankruptcy statements and schedules was misleading, or at the very least, contradictory. In each of the cases, Ms. Motley prepared a Statement of Assistance of Non–Attorney with Respect to the Filing of the Petition (Debtor Statement), which was executed by each Debtor and filed along with their statements and schedules. The Debtor Statements each indicate the following information:

DEBTOR/JOINT DEBTOR DOES HEREBY STATE AND REPRESENT THAT FOR ASSISTANCE IN CONNECTION WITH THE FILING OF THE BANKRUPTCY CASE:

1. I paid the sum of $214.00.

. . . .

4. The name of the person or the name of the firms that assisted me:

Name: We The People of Knoxville
Address: 8161 Kingston Pike
Knoxville, TN 37919
Telephone: (865) 560–2221

Name: Heather Silas,
We The People USA
Address: P.O. Box 2771
. . . .
Soldotna, AK 99669

. . . .

Similarly, on each of the Debtors' Statement of Financial Affairs, regarding question 9, concerning payments related to bankruptcy state, the following payee is referenced:

We The People—Knoxville $199.00 Typing Petition
8161 Kingston Pike $ 15.00 Copy Fee
Knoxville, TN 37919

We The People—USA
1501 State Street
Santa Barbara, CA 93101

Ms. Motley is not otherwise mentioned in the Statement of Financial Affairs, until the required certification at the end, which she has executed as the bankruptcy peti-

tion preparer. Nevertheless, it is Ms. Motley who executed the Official Form 19 Certification, the other required certifications, and the Disclosure of Compensation in each case, certifying that *she* accepted and received the $214.00 "document preparation fee" from the Debtors. On these documents, neither We the People USA nor We the People of Knoxville are the listed bankruptcy petition preparers.

The court finds it troublesome that the Debtor Statements and question 9 of the Statements of Financial Affairs do not reflect Ms. Motley's name as the bankruptcy petition preparer, especially in light of her signature for the certification as well as the other documents within the statements and schedules that do. Additionally, even though the documents executed by Ms. Motley disclose that Ms. Silas actually prepared the bankruptcy documents, as do the Debtor Statements in each case, there are no documents in any of these eleven cases actually executed by Ms. Silas as a bankruptcy petition preparer, directly in violation of § 110(b)(1), as previously discussed.

Based upon the foregoing, the court finds that Ms. Motley has engaged in unfair and deceptive acts, as set forth in § 110(i) and (j).

## VII

### Reasonableness of Fees Charged Pursuant to § 110(h)

■■■■■ The fees collected by Ms. Motley from the Debtors for the services rendered are also at issue. Section 110(h)(2) instructs the court to disallow any fee that it finds exceeds the "value of services rendered for the documents prepared." 11 U.S.C.A. § 110(h)(2). Each of these eleven Debtors paid a fee of $214.00 to Ms. Motley, representing $199.00 for the typing of the bankruptcy documents and

$15.00 for copying. In making a determination whether a fee was reasonable or excessive, the general inquiry centers around "whether the value and quality of the services provided by the preparer corresponds with the amount paid by the debtor ... [or] whether the services provided by a provider ... cause detriment to the debtor." *Hartman,* 208 B.R. at 780. In response to the Show Cause Orders, Ms. Motley bears the burden of proving that the fees she has charged and collected are not excessive. *See Alexander,* 284 B.R. at 634 ("The burden of proving the reasonableness of fees collected from chapter 7 debtors in connection with their bankruptcy cases is most logically placed on the recipient, in this case a petition preparer[.]").

"Most courts have concluded that bankruptcy petition preparer fees should be between $50 and $150, while other Courts have declined to adopt a specific rate." *Moffett,* 263 B.R. at 816. Some courts have employed a flat fee per bankruptcy case. *See Moore,* 290 B.R. at 295 (stating that $80.00 was a reasonable fee); *Alexander,* 284 B.R. at 626 (allowing a maximum flat fee of $200.00 based upon time involved with the debtor's case); *Guttierez,* 248 B.R. at 298 (finding that $50.00 is the maximum flat fee); *In re Mullikin,* 231 B.R. 750, 753 (Bankr.W.D.Mo.1999) (holding that "absent special or extraordinary circumstances, petition preparers may not charge in excess of $150.00 for their services, including any and all expenses such as photocopying, messenger or courier services, postage, telephone, etc.").

Other courts have provided an hourly rate, not to exceed a specific amount. *See Doser,* 281 B.R. at 318 (concluding that $30.00 per hour for a maximum of three hours, or $90.00, plus $.10 per page copy fees was sufficient compensation); *Landry,* 268 B.R. at 308 (allowing $75.00 per

hour, with a cap of one and one-half hours, for a maximum fee of $112.50 per case); *Moffett,* 263 B.R. at 816 (acknowledging that the court had previously allowed a flat fee of $50.00, but revising its policy to award $20.00 per hour, not to exceed $100.00); *In re Moran,* 256 B.R. 842, 851 (Bankr.D.N.H.2000) (allowing $30.00 per hour, for no more than five hours, or $150.00, as reasonable fees); *Hartman,* 208 B.R. at 780 (approving an hourly rate of $20.00).

▇▇▇ The court agrees that "to the extent the bankruptcy petition preparer provides the limited secretarial-type services, the preparer is entitled to receive reasonable compensation." *Landry,* 268 B.R. at 305. However, although directed to do so, Ms. Motley did not provide the court with precise numbers concerning the time involved for the Debtors' cases, other than those already discussed. In her Supplemental Affidavit, Ms. Motley stated that when debtors have filled out the Workbook in her store, she has "spent up to three hours 'holding the debtor's hand.'" SUPP. AFF. K. MOTLEY, at ¶ 5. She then states that "[i]n those cases where the debtor takes home the workbook, the average time I spend with the debtor (after the initial orientation) is approximately 1–2 hours reviewing the workbook for legibility and completeness and the final documents for completeness. This amount of time applies only in those cases where the workbook/petition is 35–45 pages." SUPP. AFF. K. MOTLEY, at ¶ 6. Ms. Motley does not, however, state how long she spends on cases that are shorter or longer than that average. With regards to Ms. Silas's time, Ms. Motley states that "Heather Silas told me it takes her, on the average, 1½—2 hours to transfer the information from the workbook to the official forms." SUPP. AFF. K. MOTLEY, at ¶ 7. At trial, Ms. Motley confirmed that Ms. Silas, in fact, types in the information onto the Best Case© bankruptcy software, not the actual Official Forms.

At trial, Ms. Motley testified that she did not individually derive the $214.00 total fee, but instead, relied upon instructions from We the People USA. Her Supplemental Affidavit additionally states that she is not paid on an hourly basis, nor does she pay Ms. Silas on an hourly basis. SUPP. AFF. K. MOTLEY, at ¶ 8. At trial, Ms. Motley testified that she has no knowledge of other local typing centers, what they charge, or whether they are more or less expensive than the fees charged by We the People of Knoxville.

When questioned at trial about what services the Debtors received for their $214.00 fee, Ms. Motley testified that she and We the People of Knoxville (1) provided the documents in the Customer Packet, (2) typed the documents for filing with the court, (3) answered "generic" questions "to an extent," (4) referred all legal questions to the supervising attorney, (5) completed forms when asked by the Debtors, (6) reviewed the completed Workbooks for legibility and/or completeness, (7) reviewed the typed documents for completeness and/or errors, (8) made copies, (9) in some cases, actually filed the Debtors' bankruptcy documents with the court, and (10) in some cases, "held their hand" during the process.

The court has already determined that Ms. Motley's "hand-holding" and other services provided are not permitted under either § 110 or Tennessee law. The court therefore concludes that, while Ms. Motley may be a "bankruptcy petition preparer," as defined at § 110(a)(1), the Debtors in these cases did not receive a service from Ms. Motley in that the Debtors did not obtain typing services provided by Ms. Motley. Rather, the typing services were provided by Ms. Silas, even though Ms.

Motley accepted the charged fees and certified to the court that she, personally, prepared the Debtors' bankruptcy documents.

▮ For future guidance, the court agrees with the *Guttierez* court and finds that "a reasonable fee for transcription services performed on a pro se debtor's behalf ... (including the fee for typing the documents and other expenses such as ... courier services, postage, telephone, etc.) at the current time and in the current marketplace, cannot exceed $50.00." *Guttierez*, 248 B.R. at 298. The court reiterates that the person receiving the fee must be the person who actually performs the typing services. Additionally, the court finds that Ms. Motley and We the People of Knoxville may charge a copy fee of not more than $10.00 per bankruptcy case; however, this fee may not automatically be charged in each case. Instead, each customer must be given an option to decide whether to authorize Ms. Motley and We the People of Knoxville to make copies of their completed and signed bankruptcy documents, and accordingly, be charged the $10.00 fee, or whether to take their completed documents elsewhere for copying themselves. This choice must be offered, in writing, and accepted or rejected by the prospective debtors.

▮ With respect to the eleven cases before the court, the court finds that Ms. Motley's failure to render document preparation services to any of the Debtors mandates that she be required to disgorge all fees and expenses received in each case. Accordingly, as required by 11 U.S.C.A. § 110(h)(2), Ms. Motley will be required to turnover to the Chapter 7 Trustees the total $214.00 received from the Debtors in each of the respective eleven cases within ten (10) days of this Memorandum and corresponding Order. The court will further direct Ms. Motley to certify in writing her disgorgement within fourteen (14) days. Pursuant to § 110(h)(2), these funds may be claimed exempt by the Debtors.

## VIII

### Injunctive Relief Under § 110(j)

As previously discussed, the court is authorized by § 110(j) to enjoin Ms. Motley from engaging in conduct that violates § 110, misrepresents her experience as a bankruptcy petition preparer, or constitutes unfair or deceptive actions. *See* § 110(j)(2)(A). This Memorandum is replete with findings to support the issuance of an injunction based upon the conduct and activities addressed in the court's Show Cause Orders. However, following the issuance of its Show Cause Orders and during the course of the evidentiary hearing and other proof presented, the court was made aware of other § 110 violations that provide additional reason for enjoining Ms. Motley from continuing in her current activities.[36]

### A

### Violations of § 110(c)

▮ Subsection (c) expressly requires bankruptcy petition preparers to provide their social security numbers on all documents that they are required to sign pursuant to § 110(b). *See* 11 U.S.C.A. § 110(c). Having already found that it

---

36. The following subsections were not expressly addressed by the court in its Show Cause Orders, and Ms. Motley was not specifically on notice as to any potential violations thereof. Accordingly, she is not subject to any statutory fines or to an injunction for violations occurring in these eleven cases. However, Ms. Motley is now on notice that she shall be subject to the statutory penalties prescribed under § 110 for any violations found in other cases brought before the court.

was a direct violation of § 110(b)(1) for Ms. Silas not to have executed the required certifications in each of the Debtors' cases, it follows that it was a direct violation of § 110(c) for each of those documents upon which Ms. Silas did not provide her social security number.

## B

### Violations of § 110(g)

 Additionally, the evidence before the court has exposed violations of § 110(g) by Ms. Motley and We the People of Knoxville. "Through section 110(g), Congress sought to regulate a bankruptcy petition preparer's handling of filing fees as a matter of federal bankruptcy law." *Tighe v. Scott (In re Buck)*, 290 B.R. 758, 763 (Bankr.C.D.Cal.2003). "The purpose of Section 110(g)(1) is to prohibit 'a petition preparer from taking "control" of the filing fee and ultimately controlling the timing of the bankruptcy filing.'" *Hannigan v. Marshall (In re Bonarrigo)*, 282 B.R. 101, 106 (D.Mass.2002) (quoting *In re Hartman*, 208 B.R. 768, 778 (Bankr. D.Mass.1997)). "The plain meaning of section 110(g) is that a bankruptcy petition preparer is prohibited from taking possession of a petition filing fee." *Scott v. Tighe (In re Buck)*, 307 B.R. 157, 163–64 (C.D.Cal.2004); *see also Doser*, 281 B.R. at 312.

First, in the May 6, 2004 Affidavit, Ms. Motley states "[i]f the customer wishes, we post the documents to the Bankruptcy Court and send the customer the filing information we receive back from the Court." AFF. K. MOTLEY, at ¶ 6. At trial, she testified that she had actually filed the bankruptcy documents for approximately 75% of their customers, accepting and paying the filing fee for each one.[37] In correspondence with this practice, page 10 of the Overview contains the following section and directions:

### FILING PROCEDURES

At the time your papers are filed with the U.S. Bankruptcy Court, they will require a filing fee of $200.00. If your papers are being filed by WE THE PEOPLE, your payment must be in the form of a money order or bank cashier's check made payable to the U.S. Bankruptcy Court. If you are filing your papers personally, you are also permitted to pay by cash.

At the time you sign your petition in your local WE THE PEOPLE office, you will receive a copy of the petition to take with you. After your petition is filed at the Court, WE THE PEOPLE will send you in the mail the front page of your filed petition (highlighting your case number), a receipt from the Court evidencing payment of your filing fee, and a letter informing you of the time, date, and place of your 341A Creditors' Meeting.

It will take the Court approximately seven (7) days to notify your creditors about the bankruptcy. If your creditors contact you before that time, simply give them your case number. It is their responsibility to secure any additional information they might require.

COLL. TRIAL EX. 1. Moreover, Ms. Wiley testified that Ms. Motley and We the People of Knoxville filed her bankruptcy documents and paid the filing fee.

 It is a direct violation of § 110(g) for Ms. Motley to accept filing fees, in any form, from customers. She may not "ac-

---

**37.** At trial Ms. Motley testified that she had recently received an email from We the People USA, directing her and all other We the People franchisers to no longer accept filing fees and/or file documents with the courts, and thus, she has discontinued that practice.

cept[ ] Court filing fees from any debtor for any reason. . . . Her job is solely to type the petition. She should then give the petition back to the client for filing." *Moffett,* 263 B.R. at 812; *see also Alexander,* 284 B.R. at 633 (finding that Congress expressly chose the words "collect or receive any payment," precluding bankruptcy petition preparers from taking filing fees in any form or fashion); *Bonarrigo,* 282 B.R. at 107 ("[A] procedure of instructing clients to give [the bankruptcy petition preparer] the signed petition and a money order made out to the bankruptcy court so that he can file the fee and the petition violates Section 110(g)[.]").

## C

### Injunction

■ Based upon all of the foregoing findings, the court will issue an injunction against Ms. Motley, setting forth the following:

(1) Ms. Motley shall be enjoined from providing customers with any services constituting the unauthorized practice of law and/or constituting unfair and deceptive conduct as previously discussed in detail. Specifically, Ms. Motley will be prohibited from providing customers with the Customer Packet, offering any sort of verbal advice concerning how to fill out bankruptcy petitions, statements of financial affairs, and schedules, where to file, what exemptions are allowed, any statutory references thereto, and/or any other information that could be construed by customers as offering legal advice or conclusions. Ms. Motley will also be enjoined from referring and/or recommending that customers seek answers or advice from the supervising attorney, Mr. Kohl, or any other attorney employed or used by We the People USA, We the People of Knoxville, and/or Ms. Motley. In short, the only services that Ms. Motley may provide customers seeking assistance in the preparation of bankruptcy documents is the typing of information obtained from the customers, taken from their completed, handwritten statements and schedules, on the Official Forms.

(2) Ms. Motley shall be enjoined from charging and receiving a fee more than $50.00 for providing bankruptcy document preparation services to customers. Additionally, Ms. Motley may not charge more than $10.00 for copying charges; however, all customers must be given the choice whether to pay Ms. Motley for copies or whether to take their typed documents and make their own copies elsewhere. This choice must be reflected in writing, with a separate acknowledgment and signature by each customer indicating his or her choice.

(3) Any future violations of § 110 and/or any failure on the part of Ms. Motley to fully comply with the court's Order filed contemporaneously with this Memorandum shall evidence to the court that Ms. Motley "has continually engaged in conduct described in [§ 110(j)(2)(A) ] and that an injunction prohibiting such conduct [has not been] sufficient to prevent such person's interference with the proper administration of [the Bankruptcy Code]," and the court will enjoin Ms. Motley from continuing any services as a bankruptcy petition preparer in the Eastern District of Tennessee. 11 U.S.C.A. § 110(j)(2)(B).

## IX

In summary, the court first finds that Ms. Motley has violated § 110(b)(1), as evidenced by her failure to sign twelve separate documents requiring the certification of a bankruptcy petition preparer. In its discretion, the court will not impose upon Ms. Motley any of the statutory fines allowed under § 110(b)(2) for her viola-

tions. Second, the court finds that Ms. Motley has engaged in the unauthorized practice of law, prohibited by § 110(k) and Tennessee Code Annotated section 23-3-103. This unauthorized practice of law, along with other actions taken by Ms. Motley, constitutes unfair and deceptive acts under § 110(i) and (j). Accordingly, the court will enjoin Ms. Motley from performing any services for Debtors other than the mere typing of bankruptcy petitions, as set forth above. Third, the court finds that the $214.00 fees charged by Ms. Motley and paid by the Debtors in each of the eleven cases that are the subject of this Memorandum are in excess of the services they received, and Ms. Motley will be directed to disgorge the fees in each Debtors' case. Finally, because § 110(i) instructs the court to certify any findings that Ms. Motley has violated any section of § 110 and/or has engaged in unfair and deceptive acts, these findings shall be certified to the United States District Court for the Eastern District of Tennessee, whereby any of the Debtors may seek damages from Ms. Motley as set forth in § 110(i).

An order consistent with this Memorandum will be entered.